

NUMBER 13-10-00090-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

SEBASTIAN WILLIE MEJIA,        **Appellant,**

**v.**

THE STATE OF TEXAS,           **Appellee.**

## On appeal from the 377th District Court
## of Victoria County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Chief Justice Valdez

Appellant, Sebastian Willie Mejia, was convicted of engaging in organized criminal activity, a first-degree felony. *See* TEX. PENAL CODE ANN. §§ 19.02, 71.02 (West 2011). Mejia was sentenced to life imprisonment.[1] By five issues, in his pro se brief, Mejia contends that: (1) the evidence is legally and factually insufficient; (2) the

---

[1] The jury found that appellant was a repeat felony offender. *See* TEX. PENAL CODE ANN. § 12.42 (West Supp. 2011).

State engaged in prosecutorial misconduct for a variety of reasons; (3) the trial court abused its discretion by "not allowing [him] to object to trial counsel and forcing [him] to trial with an attorney with whom he ha[d] become embroiled in irreconcilable conflict"; (4) the trial court improperly admitted certain evidence at trial; and (5) defense counsel was ineffective.[2]  We affirm.

## I.    THE EVIDENCE

The State presented the testimony from, among others, Rosie Ann Arce, Janet Sertuche ("Janet"), Kelly Flood, Harminda Narula, M.D., Holly Jedlicka, Chris Garcia, Walter Henson, Charles Ray Goble, Mistie De Los Santos ("Mistie"), John McNeill, M.D., Paul Garcia, Calvin S. Story Jr., Justin De Los Santos ("Justin"), Amanda Clemons, and Pedro Reyes Jr.  The trial court also admitted numerous State's exhibits at trial, including, among other things, an audio recording of Sertuche's call to 911, and a video recording of the crime scene.  Mejia testified on his own behalf.  He also presented the testimony of Detective Clemons among others.

### A.    Arce

Arce testified that on Tuesday, October 30, 2007, her son Derrick Quintanilla died as a result of a gunshot wound to the head.  At the time of his death, Quintanilla had been dating Mistie for approximately four months.  Quintanilla's body was found at Mistie's residence in Victoria, Texas.

### B.    Janet Sertuche

Janet testified that Mistie is her daughter and Justin is her son.  On October 30, 2007, Janet lived on Guadalupe Street in Victoria.  Quintanilla occasionally spent the

---

[2] We have renumbered and reorganized Mejia's six issues.

2

night at Janet's home. Justin and Quintanilla's relationship was frayed when Quintanilla began dating Mistie; however, the conflict had been resolved before Quintanilla's death. According to Janet, Quintanilla and Mistie had been dating for almost two years. Mistie was fifteen at the time of Quintanilla's death and Quintanilla was seventeen.

Mejia was dating Janet's sister, Natalie Sertuche. On October 28, 2007, Quintanilla and Mistie babysat Natalie's children at her apartment. Janet assumed that Mejia also resided at the apartment because "[h]e was there." On that day, Janet had to go to Natalie's apartment to check on Natalie's son and her other sister Paula's two sons because there was an automobile accident. The accident involved Paula, Natalie, and Mejia. Paula and Natalie went to the hospital. Mejia was injured; however, he did not go to the hospital.

When Janet arrived at Natalie's apartment, she saw Mejia and Quintanilla arrive also. This occurred in the morning hours of October 28. When the police arrived at the apartment complex, Mejia told Janet he did not want to be there, so she took him to her residence. When Janet later took Mejia back to Natalie's apartment, Mejia complained that his wallet and money were missing. Mejia believed that he had forgotten his wallet in his brother, Paul's car. The wallet was found in Natalie's apartment on the kitchen table the next morning.

Janet stated that subsequently, she called Natalie[3] and that Mejia took the phone away from Natalie and said, "'That was fucked up, what they did, screwing me over like that, when I was all messed up. But they're going to pay. There's nothing you can do to protect them. I've already called my boys and they are coming down [and they're on

---

[3] It is unclear from Janet's testimony when she called her.

3

their way] and they don't play.'"  According to Janet, Mejia stated that Quintanilla, Mistie, and Justin should be concerned about his threat.

Quintanilla spent the night at Janet's residence on October 29, 2007.  Janet had the overnight shift at work and returned home at "around" 7:45 a.m.  Mistie needed to go to school, and Quintanilla had an appointment at the attorney general's office.  Janet took Mistie to school some time after 8:00 a.m.  Justin and Quintanilla remained at home.  When Janet left, Justin was asleep and Quintanilla was attempting to go back to sleep.

After dropping Mistie off at school, Janet went to her other daughter's residence.  While there, Janet received a phone call from an unknown person.  The caller told Janet that "there would be police officers up in [her] house.  They wanted to know if [her] son was at home and, if not, he has a key—There was going to be a lot of law at [her] house."  Janet immediately returned home and discovered that the screen door was torn and the "plexiglass on [her] front door was pushed in."  Janet then went to her bedroom and discovered Quintanilla's lifeless body.

Janet stated that Justin and Quintanilla both had friends that were in different gangs.  Janet did not know whether Justin was associated with any gangs.  According to Janet, Justin and Quintanilla had been involved in altercations with members of gangs. Janet once witnessed Justin and Quintanilla fighting with some boys at Natalie's apartment complex.

4

## C. Flood

Officer Flood, a Victoria Police Department Officer, responded to Janet's call to 911. While at Janet's residence, Janet told Officer Flood that she knew who had killed Quintanilla but would not reveal the person's identity out of fear. Officer Flood said:

> She began talking about a car accident that [Quintanilla] and her daughter had called her about. There was another guy with them at the time and she was supposed to go—[t]hey were supposed to—[s]omebody was supposed to go pick this guy up, along with [Quintanilla].
>
> . . . .
>
> And she believed that that was the guy who had killed him.

A nine-millimeter casing was found at the crime scene. Quintanilla had been shot in the face and was bleeding from his nose. Flood found that Quintanilla had a "very faint and very weak" pulse.[4]

On re-direct examination, Flood testified that Janet told her that "her daughter and [Quintanilla] had received a phone call from the guy they had given a ride to and he believed that Mistie and [Quintanilla] had taken his wallet and he wanted the money back or he was going to come back after them." Janet was "concerned for herself and her family. After that, her main concern was getting in touch with her daughter, who was at school, and making sure no one would harm her daughter."

## D. Dr. Narula

Dr. Narula is a forensic pathologist who works for the Nueces County Medical Examiner's Office as a contract medical examiner. The autopsy showed that Quintanilla had been shot in the right cheek. There was "tiny gunpowder stippling" around the

---

[4] Another responding officer, Zachary Thomas McDaniel testified that he could not recall whether Quintanilla had a pulse.

wound. There was also "very few scattered, tiny splitting marks on the upper eyelid and on the side of the nose." Dr. Narula opined that the wound was caused by a handgun at "close-range" held "anywhere from two to four inches" away from Quintanilla's head. The bullet was located "inside the skull [in the] tissue on the left side of the back of the head." The gunshot wound was the sole cause of Quintanilla's death. The manner of death was classified as a homicide. A bullet that was recovered from Quintanilla's body was released to Jedlicka on October 31, 2007.

## E.    Jedlicka

Jedlicka is a crime scene supervisor with the Victoria Police Department. One of Jedlicka's job duties is to "develop latent prints" and she has been trained to "do identifications, through fingerprint analysis." Among other things, Jedlicka took photographs of the crime scene at Janet's residence, processed evidence, and kept the chain of custody of the evidence. Jedlicka collected a spent shell casing from the bedroom floor at the crime scene. Jedlicka also collected a portion of the plexiglass from Janet's front door. Crystal Lara lifted a palm print from the plexiglass. On cross-examination, Jedlicka clarified that the print was located "at the very bottom [of the plexiglass], where it was pushed in."

## F.    Officer Garcia

Officer Garcia, a police officer with the Victoria County Sheriff's Office, is a "gang expert." According to Officer Garcia, the Texas Syndicate is a prison gang that has identifying marks including, among other things, the Texas Longhorns logo. "Sometimes they'll have an 'S,' with a five point star in the middle. It's not for sure. Also, they're called 'Los [Cuernos],' . . . which means—which basically, means horns, in

Spanish—or, longhorns is a better description." Officer Garcia stated that some members have "TS" or "1920 Specialty" instead of "TS" because S is the nineteenth letter of the alphabet and T is the twentieth.

Officer Garcia explained that persons confirmed to be members of groups such as the Texas Syndicate in prison are "placed in administrative segregation, which is basically, locked up for hours." Therefore, many of the members "try to disguise their membership, so it's not readily available or recognizable to security guards or correction officers. . . ." Officer Garcia testified that the Texas Syndicate is also considered a street gang. Officer Garcia stated that to acquire money, the organization engages in "[e]xtortion, narcotics, assaults, contract hits—[t]hat kind of thing." According to Officer Garcia, the organization is comprised of three or more members who participate in the commission of criminal activity. Officer Garcia stated that specifically in 2007 there were at least ten members of the Texas Syndicate in Victoria.

Officer Garcia testified that he believed that Mejia is "associated with the Texas Syndicate." Officer Garcia described Mejia as "an up-and-coming member" of the Texas Syndicate. Officer Garcia believed that Mejia's numerous tattoos showed his affiliation with the group and that he had attempted to camouflage that affiliation. During his testimony, Officer Garcia referred to pictures of Mejia's tattoos that had been "highlighted" in order to show the camouflaged images. The pictures were admitted for demonstrative purposes over Mejia's objection that they "were altered and the alterations weren't by [Officer Garcia] and it [had not] been established who did the alterations."[5]

_____

[5] During a proceeding outside the jury's presence, District Attorney Steven Tyler stated that he had altered the exhibits.

7

When the State published the pictures of Mejia's tattoos to the jury on an overhead projector, Officer Garcia "trace[d] over" one tattoo, stating there is the shape of a "T" and another image "could be considered to be an 'S.'"[6] The picture Officer Garcia "trace[d] over" had not been "highlighted." Officer Garcia repeated his tracing over the shapes depicted in several other pictures of Mejia's numerous tattoos. Officer Garcia also stated that many of Mejia's tattoos also had the "cuernos" or horns which in his opinion were indicative of membership in the Texas Syndicate.

According to Officer Garcia, a high ranking member of a gang cannot tolerate "disrespect from gang members with less rank, . . . other gangs or from known gang members" because that is a sign of weakness. Members of the gang who have been disrespectful would be disciplined, such as being "beat down, hurt very, very seriously, someone could be killed. It depends on how serious the disrespect was and that it wasn't handled." Officer Garcia explained that if a senior gang member failed to discipline a member who was disrespectful, that senior member could also be in trouble with the "higher ups."

Officer Garcia agreed that "maintaining the prestige of the Texas Syndicate is part of the Texas Syndicate business." According to Officer Garcia, a member of the Texas Syndicate in a leadership position could be demoted or "removed completely" if he failed to "uphold the prestige" of the organization, or "his individual prestige and respect." To be "removed completely" means that the person is killed.

The State asked, "Now a hypothetical—[i]f a person was a member of the Texas Syndicate and he allowed a non-member, or a person affiliated with a street gang, to

---

[6] It is apparent from the record that Officer Garcia used a laser pointer to "trace over" the images.

8

rob him personally or 'jack' him personally, would he have a responsibility, as a Texas Syndicate member, to take action?" Officer Garcia responded:

> Yes. He would [have] responsibility to correct what was done about the reputation of the Syndicate . . . . [And] [t]hat would be [gang business]. It would be looked at by the higher ups, to make sure it's being taken care of properly. . . . [If the person who committed the jacking was being recruited by the Texas Syndicate i]t would make it more imperative for him [the leader] to [discipline the recruit]. They are coming up with the prospect of 'esquina,' which is the corner before it hits 'prospecto.' And once they are 'prospecto,' they have to do things correctly. And when they fail to do that, they have to suffer the consequences, to get on the correct track. And it's the responsibility of the leadership to correct that or have somebody to enact it for them.

Officer Garcia did not know whether Quintanilla was a member of the Texas Syndicate. Officer Garcia indicated that he did not know anything about Quintanilla. Officer Garcia testified that Mejia's father and brother were both confirmed members of the Texas Syndicate and that, individuals often become members of the organization by way of a legacy membership. Officer Garcia explained a legacy means that someone in the family is already a member of the organization. On cross-examination, Officer Garcia agreed that it was suspected that Mejia was a leader of the organization.

**G. Hanson**

Hanson is a latent print examiner with the crime lab of the Texas Department of Public Safety ("DPS"). He stated that no two people have the same fingerprints. When identifying an unknown print, Hanson compares it to an exemplar of a known person's prints. The State asked Hanson to explain the process in comparing an unknown print to an exemplar. Hanson replied:

> The skin on your hand is different than the other areas of your body. It's rough and it's textured. It's raised. There are corrugations or ridges and furrows. These ridges, while flowing in a pattern, tend to end abruptly or they tend to fork into two or more ridges or they have short

9

ridges or islands or dots. And we take those characteristics and we make sure that they share the spatial relation in the tow prints and that they're the same in both prints, to make on identification—

Hanson agreed that when comparing the prints, he is "looking for . . . the same fork on the same pattern." Hanson explained:

> There are several other things, in addition to the characteristics or points that come in as a factor in an identification.
>
> Are the two pattern types the same? Are they both loops? Are they both arches?
>
> Again, they have to have the same characteristics in the same space and share the same space and be the same, for there to be an identification.

Before DPS will confirm the prints belong to a certain person, Hanson "usually like[s] to have anywhere from 8 to 12 points" or identifiers. Hanson identified State's exhibit 131 as a copy of a lift card of an unknown print submitted to him.[7] Hanson identified State's exhibit 132 as a copy of a palm print card belonging to Mejia sent to him. Hanson compared the unknown print in State's exhibit 131 with Mejia's print in State's exhibit 132. Hanson determined that the unknown print in State's exhibit 131 matched the print in State's exhibit 132. There were a little over sixteen points of identification. Hanson stated that he was sure that the prints matched and that his work was reviewed by another latent print examiner who came to the same conclusion. According to Hanson, the unknown print was "recovered from the bottom left of the plexiglass window" lifted by "C. Lara."

---

[7] The original was kept by the DPS for further reference.

## H.    Sergeant Goble

Sergeant Goble is a supervisor for the dive recovery team with the DPS. Sergeant Goble was asked to assist the Victoria Police Department with a dive to recover a nine-millimeter handgun used in a homicide from a small canal in Calhoun County in Port Lavaca.

Before the dive began, a man had indicated where to find the gun, which was located under a bridge.[8]   The man, later identified as Paul Garcia, threw a rock and stated that the gun had landed in the same vicinity of the rock's location.  Based on this information, Sergeant Goble searched the area and found a semi-automatic black handgun in water approximately six feet deep.

## I.    Mistie

Mistie's mother is Janet, and she has two brothers, Justin and Adam Juntunen. Her aunts are Paula and Natalie.   Quintanilla was Mistie's boyfriend, and they had dated for approximately two years.

On Saturday, October 27, 2007, Mistie and Quintanilla went to Natalie's apartment.  Mejia, Quintanilla's son, Paula's children, and Natalie's children were at the apartment.   Mistie and Quintanilla were there to babysit the children because Mejia, Natalie, and Paula planned to go to a club that evening.  Mistie testified that sometime that evening, Mejia called Quintanilla asking for a ride because he had been involved in a car accident.  Sometime later that evening, Quintanilla went to pick up Mejia and gave him a ride to Mejia's brother's house.  Quintanilla returned alone to Natalie's apartment.

---

[8] Sergeant Goble could not recall the man's name.  However, on cross-examination, Sergeant Goble agreed that the name "Paul Garcia" did "ring a bell."

11

Later, Mejia called again, and Quintanilla picked him up, and they both returned to Natalie's apartment.

Mistie called Janet and informed her about the accident and asked her to come and pick up Mejia at Natalie's apartment. Janet arrived at the same time that Quintanilla and Mejia arrived. Mistie went outside to greet them. The police drove by the apartment complex, and everyone went inside Natalie's apartment. Mistie testified that Mejia stated that he needed to leave the apartment complex before the police came back because he had been involved in a car accident.

Janet gave Mejia a ride in Quintanilla's truck. According to Mistie, Quintanilla was not supposed to be at the apartment complex because he had been in an altercation with a street gang called "COPS." Janet and Mejia later went back to Natalie's residence. Mejia told Mistie that his chest hurt because the steering wheel hit his chest.[9] Mejia stated that he lost his wallet. Although Mistie helped search for the wallet, it was not found.

Quintanilla and Mistie spent the night at Natalie's apartment. The next morning, Janet, Justin, and Mejia arrived at the apartment, and they again searched for Mejia's wallet.

On Monday morning, October 29, there was no school. Mistie was talking on the phone with Quintanilla when he asked her to hold because he had a call from Mejia. Quintanilla returned to the line with Mistie and told her that Mejia accused him of taking his wallet. According to Mistie, Mejia claimed that Justin told him it was Quintanilla who

---

[9] Dr. McNeil testified that on Sunday, October 28, 2007, he treated Mejia in the emergency room for pain to the chest due to an injury sustained from striking the steering wheel. Dr. McNeil also noted that Mejia had a seatbelt injury. According to Dr. McNeil, Mejia's alcohol level was .34 units "over four times the legal limit."

12

stole his wallet. Mistie testified that Mejia said that Quintanilla "better give him his stuff back or there was going to be problems," "'You don't know where I come from. Don't play with me. I don't play games,'" and that "'he had other people coming down.'" Mistie believed that Quintanilla "kind of took it as a threat."

Justin then told Mistie that Mejia had called him and accused him of stealing his wallet. According to Justin, Mejia stated that Quintanilla told him that Justin had taken the wallet. Mejia made similar threats to Justin and also stated that "he had already made a phone call." Justin did not clarify whom Mejia had allegedly called.

On Tuesday, October 30, 2007, Mistie went to school at approximately 8:00 a.m. While at school, a tube of lip gloss leaked in Mistie's pocket, so she called Quintanilla to bring her a fresh pair of pants. Mistie called Quintanilla a second time at approximately 9:15 a.m. to find out how long it would take for him to bring her the pants. Quintanilla told her he would be there in about five minutes and instructed her to wait outside. During the second conversation, Quintanilla mentioned to Mistie that Justin had just left for work.

Mistie testified that when she left for school that morning, the front door was not in the condition it was in when Janet discovered Quintanilla's body. According to Mistie, the residents of Janet's home never actually locked the door. Instead, when someone was home, they barred the door from the inside with a piece of wood across the frame approximately three inches below the doorknob. Mistie stated that someone could reach in and remove the bar if the person pushed on the plexiglass.

13

### J.   Sergeant Story

Sergeant Story is a firearms examiner with the DPS Safety Crime Lab in Austin, Texas.  Sergeant Story examined the cartridge case found on the floor in the bedroom where Quintanilla was shot, the bullet recovered from Quintanilla's head, and the gun Sergeant Goble found in the canal.  Sergeant Story "found that the cartridge case was fired in a firearm, of a 9 x 18 Makarov caliber."   Sergeant Story stated in his report that the bullet "was fired from a firearm capable of chambering and firing a "9x18" Makarov caliber cartridge."  He also generated a list of possible firearm brands that could have fired the bullet, including, "but not limited to, Makarov IJ70, Russian PM, Norinco, IMEZ, Baikal, and FEG."

In a report admitted as State's exhibit 128, Sergeant Story stated that the bullet found in Quintanilla's head was fired from the "9x18 Mark" gun Sergeant Goble found in the canal.  Sergeant Story also testified that, based on his analysis, it is his opinion that the bullet was fired from the gun Sergeant Goble found in the canal.  The State asked whether he was certain that the bullet came from that weapon; Sergeant Story replied, "I am certain.  I am here staking my reputation and my 35 years experience on the fact that that bullet was fired through this firearm.  If there was any doubt, there would have been—we would have issued a report, stating that we were unable to determine."  According to Sergeant Story, a "fellow examiner," Tim Counce, confirmed his findings.

### K.   Reyes

Reyes was an inmate at the Victoria County Jail and incarcerated for criminal mischief at the time of Mejia's trial.  Reyes stated that he knows Mejia as "Ghost" and that Mejia was in jail cell 1015.  Reyes was in cell 1012.  Reyes testified that he was in

14

the "criminal street gang" HPL and is an "'X'd' out member." Reyes stated that Mejia told him that he is a member of the Texas Syndicate. According to Reyes, Mejia asked him to get Garcia's address; however, Reyes was unable to get the address.

According to Reyes, after discovering that Garcia was going to be a witness in Mejia's case, he told Mejia that it was "very disrespectful for [Mejia] to come to [Reyes] for the address . . . ." Reyes claimed that while in jail, Mejia had trouble sleeping because [Mejia] "kept seeing that little kid had a hole in his face." Reyes testified that Mejia had threatened Reyes personally twice and Reyes's family once for providing information concerning Garcia to the State. Reyes stated that he had not made a deal with the State for his testimony, and he did not have any pending criminal cases.

## L. Garcia

Garcia testified that he is known as "Polito" and that his father, "Polito Garcia— Paul," was a member of the Mexican Mafia from the age of eighteen until his death at the age of fifty-two in a motorcycle accident. Garcia met Mejia at a friend's house in Port Lavaca sometime before 2007.

Garcia testified that he is not in a gang, but that Mejia is a member of the Texas Syndicate. Garcia stated that he knew that Mejia was a member of the Texas Syndicate because "[h]e bragged about it" and he "even has a tattoo for it."

Garcia testified that Mejia told him that he believed that Quintanilla had stolen $100 to $150 from him while he was passed out. Garcia thought that perhaps the next day, Mejia asked him to pick him up from Natalie's apartment complex. Mejia allegedly asked Garcia to bring a gun. Garcia said that he took a nine-millimeter gun with him. Mejia took the gun out of the center console and "stuck it in his pants."

15

According to Garcia, while they drove to Justin's house, Mejia stated that he was mad and told him he knew that Quintanilla was at Justin's house. Garcia stated that he did not think that Mejia would kill Quintanilla; he believed that Mejia "was going to go push his weight and reputation around and get his money back." Garcia assumed that Mejia would use the gun to scare Quintanilla.

Garcia dropped Mejia off by Janet's house, and while driving by an HEB, he received a call from Mejia to pick him up again. Garcia turned around and picked up Mejia. Garcia drove Mejia back home. The next day, Garcia heard on the news that Quintanilla had been killed. Garcia stated that he "got scared" and disposed of the gun by throwing it in a "little creek that runs out to the bay" in Port Lavaca. Subsequently, Mejia called Garcia asking Garcia to dispose of the gun. Garcia assisted the dive team in retrieving the gun from the water.

## M.     Justin

Justin stated that on the Sunday after Mejia lost his wallet, he received a phone call from Mejia.[10] Justin testified that Mejia said "that [Quintanilla] had said he seen me with the wallet and we better take that money back, because we don't know who he is and shit like that don't happen to him." According to Justin, Mejia also stated, "some home boys were going to be coming down to take care of that issue." Justin believed that Mejia was threatening him and that the "home boys" were "friends that are in his gang . . . [the] Texas Syndicate." Justin learned that Mejia had made a similar phone call to Quintanilla.

---

[10] The State asked Justin to review Mejia's phone records. Justin identified a call from Mejia's phone to Quintanilla's phone that occurred on October 28, 2007 at 9:42 p.m. Justin stated that at 9:40 p.m. there was another call from Mejia's phone to Justin's phone.

16

On October 30, 2007, Justin received a call from Mejia at about 7:30 a.m.[11] Mejia allegedly said, "Fuck you. All my boys are coming down. We're going to take care of you." Justin's employer picked him up for work at approximately 8:00 a.m. or 8:15 a.m.[12] Justin testified that at about 9:00 a.m., Mejia called him and stated, "The laws are fixing to home up dirty—[w]ell, approach me dirty." According to Justin, Mejia "was telling—trying to get [him] to meet him at [Garcia's] house." Justin had already learned of Quintanilla's death when he received this call from Mejia.

The State asked Justin if the screen door was torn and if the plexiglass had been pushed in when he left for work. Justin said "No." Justin agreed that if someone wanted to get into the house, they could have removed the barricade on the front door by pushing in the plexiglass.

## N.    Detective Clemons

Detective Clemons of the Victoria Police Department interviewed Garcia who did not tell her that he provided the gun for Mejia to use. On cross-examination by the State, Detective Clemons stated that Garcia appeared fearful, but she believed that he was being truthful. Detective Clemons testified that Garcia told her that as a member of the Texas Syndicate, Mejia was capable of killing him.

Detective Clemons reviewed the phone records that had been subpoenaed for the trial. According to Detective Clemons, those phone records corroborated the witnesses' claims that Mejia had called them to intimidate them. Detective Clemons

---

[11] The phone records showed that on October 30, 2007, there was a call from Mejia's phone to Justin's phone at 6:35 a.m. There was another call from Mejia's phone to Justin's phone at 6:53 a.m. on that same day. Justin did not recall these phone calls. Finally, the phone records reflect that there was another call from Mejia's phone to Justin's phone at 7:32 a.m.

[12] Justin lived with Janet at her residence.

17

testified that the phone records she reviewed also corroborated Garcia's claims that he drove Mejia to the crime scene and picked him up after Quintanilla was killed.

Detective Clemons agreed that Mejia was found in Sinton, Texas and knew that he was "wanted in this jurisdiction." The State asked Detective Clemons if she believed Mejia was fleeing, and she replied, "Yes." Detective Clemons also agreed that her investigation focused on Mejia based on the following: his fingerprints were found at the crime scene; he threatened witnesses; Garcia gave him a ride to the crime scene; and the bullet recovered from the victim matched the gun recovered by the dive team. Detective Clemons suspected that Mejia is a member of the Texas Syndicate.

**M.      Mejia**

Mejia denied being a member of the Texas Syndicate. He denied threatening and killing Quintanilla, threatening Justin, and asking Garcia for a gun. Mejia denied that his tattoos were related to the Texas Syndicate and explained that all his tattoos "came out of a 'Flash' magazine."

## II.      SUFFICIENCY OF THE EVIDENCE

By his first issue, Mejia contends that the evidence is legally and factually insufficient to support the judgment. Mejia argues that there is no evidence he was in a gang and there is no non-accomplice evidence linking him to the crime.

**A.      Standard of Review and Applicable Law**

The court of criminal appeals has held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support

18

each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902–03, 912 (Tex. Crim. App. 2010) (plurality op.). Accordingly, we will review Mejia's claims of evidentiary sufficiency under "a rigorous and proper application" of the *Jackson* standard of review. *Id.* at 906-07, 912. Moreover, we will not refer separately to legal or factual sufficiency and will only analyze Mejia's issues under the *Jackson* standard. *See id.* at 985 (concluding that there is no meaningful distinction between a legal and factual sufficiency analysis). Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 898–99 (explaining that in the *Jackson* standard we consider "all of the evidence in the light most favorable to the verdict," and determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt).

"[T]he fact[-]finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original). "The jury, in all cases is the exclusive judge of facts proved and the weight to be given to the testimony . . . ." TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979). "The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

19

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A person commits the offense of engaging in organized criminal activity if "with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit" murder. *See* TEX. PENAL CODE ANN. §§ 19.02, 71.02. "'Criminal street gang' means three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." *See id.* § 71.01(d) (West 2011).

**B.      Discussion**

Viewing the evidence in the light most favorable to the jury's verdict, we find that the evidence showed the following:  (1) Mejia's "home boys," meaning other members of the Texas Syndicate, were going to retaliate against Justin and Quintanilla for stealing his wallet; (2) Mejia is a member of the Texas Syndicate; and (3) the Texas Syndicate has three or more persons having several common identifying signs and symbols and the organization has identifiable leadership who regularly associate in the commission of criminal activities. *See id.*

We conclude that a reasonable fact-finder could have found that Mejia was a member of a gang. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 898–99. Thus, the evidence is sufficient in that respect.

Next, Mejia argues there was no non-accomplice evidence linking him to the crime. We disagree.

20

A person cannot be convicted based upon the testimony of an accomplice unless that testimony is "corroborated by other evidence tending to connect the defendant with the offense committed. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). It is not necessary for the corroborating evidence to be sufficient in itself to establish guilt beyond a reasonable doubt. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (en banc). The non-accomplice evidence does not have to link the accused directly to the commission of the offense. *Id.* However, there must be some non-accomplice evidence that tends to connect the accused to the commission of the offense. *Id.* Both direct and circumstantial evidence may furnish the necessary corroboration. *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988) (en banc). "Insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of accomplice witness testimony." *Id.*

Appellant acknowledges that his palm print was discovered by police on the plexiglass door of the crime scene. Mistie testified that in order to get into the home, one could push the plexiglass in and remove the wooden barrier. Justin and Mistie stated that the plexiglass had not been pushed in when they left the home the morning Quintanilla was killed. Therefore, the palm print is non-accomplice evidence tending to connect Mejia to the commission of Quintanilla's murder. In addition, Justin, Mistie, and Janet testified that Mejia threatened to harm Quintanilla because Mejia claimed that Quintanilla stole his money. *See Bush v. State*, 628 S.W.2d 441, 444 (Tex. Crim. App. 1982) (en banc) (providing that motive is relevant as a circumstance tending to prove the commission of an offense); *see Reed*, 744 S.W.2d at 127 (stating that, although evidence of motive alone is insufficient as corroboration, it may "be considered in

21

connection with other evidence tending to connect the accused with the crime"). Detective Clemons testified that phone records corroborated Garcia's testimony that he was with Mejia at the time that the murder occurred. *See Reed*, 744 S.W.2d at 127 (providing that evidence that the accused was at or near the scene of the crime at or about the time of its commission, coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction). Finally, Detective Clemons agreed with the State that Mejia had fled to Sinton after Quintanilla had been murdered. *See Gosch v. State*, 829 S.W.2d 775, 782 (Tex. Crim. App. 1991) (finding that the appellant's attempted flight was a factor that tended to connect him to the murder). We conclude that the above non-accomplice evidence was sufficient to connect Mejia to the commission of Quintanilla's murder. To the extent that Mejia complains that Garcia's testimony was contradictory, however, we conclude that it was within the exclusive province of the jury to reconcile those conflicts in the evidence *See Wesbrook*, 29 S.W.3d at 111. We overrule Mejia's first issue.

### III.   INCONSISTENCIES IN THE WITNESSES TESTIMONY

By a sub-issue, Mejia argues that the witnesses committed perjury. However, Mejia merely points to inconsistencies in the witnesses' testimonies. These conflicts in the evidence were within the exclusive province of the jury to reconcile. *Id.* Accordingly, we overrule Mejia's sub-issue.

### III. PROSECUTORIAL MISCONDUCT

By his second issue, Mejia asserts that the State engaged in prosecutorial misconduct by: "(a) soliciting testimony the prosecutor knew to be false[13]; (b) submitting false information to the trial court to secure a favorable ruling[14]; (c) withholding evidence favorable to the defense; (d) continuously disregarding ruling [sic] against soliciting improper testimony; and (e) making improper comments on closing."

In this multifarious issue, Mejia does not present a clear argument supporting his bald assertions that the State engaged in prosecutorial misconduct. *See* TEX. R. APP. P. 38.1(i); *Stults v. State*, 23 S.W.3d 198, 208 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). As such, we may refuse to review Mejia's multifarious issue or we may elect to consider the issues if we are able to determine, with reasonable certainty, the alleged error about which the complaint is made. *Stults*, 23 S.W.3d at 205; *Shull v. United Parcel Serv.*, 4 S.W.3d 46, 51 (Tex. App.—San Antonio 1999, pet. denied). We will only address the alleged errors that we are able to determine with reasonable certainty. *See Stults*, 23 S.W.3d at 205; *Shull*, 4 S.W.3d at 51. Those issues we do not address are inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

Mejia complains that the State failed to disclose the latent palm print found on the plexiglass before it used it at his trial, in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* concerns material which is exculpatory. *See id.* However, the palm print

---

[13] Mejia does not cite where in the record the State allegedly solicited false testimony. *See* TEX. R. APP. P. 38.1(i). Moreover, in his brief Mejia, without any evidentiary support, accuses all of the witnesses and the prosecutor of lying at his trial. Accordingly, we conclude that this assertion is not adequately briefed. *See id.*

[14] We cannot discern Mejia's argument concerning this claim. *See* TEX. R. APP. P. 38.1(i).

23

in this case actually links Mejia to the commission of the murder. Therefore, *Brady* is not applicable in this case. Nonetheless, as Mejia acknowledges, his trial counsel did not object at trial on the basis of *Brady*. Therefore, this argument is not preserved. *See Keeter v. State*, 175 S.W.3d 756, 761 (Tex. Crim. App. 2005) (establishing that by not raising a separate claim related to *Brady*, "the appellant did not preserve for appellate review his complaint that the trial court erred in failing to grant his motion for new trial on the basis of a *Brady* violation").

Mejia does not cite any location in the record where the prosecutor made any improper comments during closing arguments. Furthermore, the trial court sustained the only objection made by Mejia's trial counsel to the State's closing argument. Therefore, to the extent that Mejia complains of any other alleged improper comments made by the State, we conclude that those complaints have not been preserved because he did not object to any other comments made by the State. *See Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004) (providing that the appellant must object to improper closing argument); *see Adams v. State*, No. 13-09-334-CR, 2010 Tex. App. LEXIS 5588, at *41 (Tex. App.—Corpus Christi July 15, 2010, pet. ref'd) (mem. op., not designated for publication) ("[F]ailure to object to jury argument forfeits the right to raise the issue on appeal.").

Accordingly, we overrule Mejia's second issue.

### IV. DENIAL OF MEJIA'S MOTION TO SUBSTITUTE COUNSEL

By his third issue, Mejia complains that the trial court abused its discretion by not allowing him to substitute his trial counsel. Without citation to the record, Mejia makes the bald assertion that the trial court did not read his letter motion requesting a

24

substitution of counsel. Mejia then states that the trial court "went so far as to order" Mejia's "silence" during a "pretrial hearing." Mejia does not cite to the record of this pretrial hearing but claims he was denied access to the courts. We find that Mejia's claim that he was denied access to the courts is without merit. Moreover, we have reviewed transcripts of pretrial hearings held on May 14, 2008, May 28, 2008, August 19, 2008, September 19, 2008, December 17, 2008, January 21, 2009, March 26, 2009, April 15, 2009, April 17, 2009, April 20, 2009, April 20, 2009, and June 10, 2009. The trial court did not order silence from Mejia at any of these hearings.

At the April 20, 2009 hearing, Mejia stated that he objected to the "way [his] case ha[d] been handled" because he had not "received hardly any statements or police reports" and did not "know anything about the case." The trial court explained that "[u]nder the open file discovery . . . the attorneys are able to get information they would not otherwise be able to get on discovery, but they're not able to give [the defendant] copies of those documents . . . ." Mejia stated that he understood the open discovery policy and did not want copies but wanted twenty minutes of the attorney's time. Mejia's lead trial counsel, Luis Martinez, was apparently ill and was not present at this hearing. The trial court stated that it would determine whether second trial counsel, Alex Luna, would take over for Martinez at the next hearing.

At the next hearing held on April 24, 2009, the trial court stated it would be deciding whether Luna would be taking over for Martinez. Luna told the trial court that Mejia was informing him that it was possible that "an attorney out of Corpus [would] be representing him, also." The trial court then reset the trial for June 10, 2009. Mejia then stated, "That will give me time to talk to the attorney." Mejia then complained that the

25

ankle restraints he was required to wear while in jail were causing sores. The trial court then asked if he preferred to set a pre-trial hearing instead. Luna stated he would. So, the trial court stated, "All right. Then, June 10, at 9:00 a.m., for jury announcements. . . . Right now Mr. Martinez is still in the case. If he's able to assist fine, but, if it's determined that you need someone else to assist you, you know, for the trial, then I will appoint another attorney to assist you."

Mejia does not cite to any point in the record wherein the trial court denied his request to substitute counsel. *See* TEX. R. APP. P. 38.1(i). In fact, it appears from the record that the trial court was willing to work with Mejia concerning appointment of new trial counsel. We are not required to review this voluminous record in order to determine whether the trial court abused its discretion. *See Russeau v. State*, 291 S.W.3d 426, 437 (Tex. Crim. App. 2009) (refusing to search a voluminous record to determine whether the appellant preserved complaint for appellate review); *Segundo v. State*, 270 S.W.3d 79, 106 (Tex. Crim. App. 2008) ("It is not the appellate court's responsibility to wade through voluminous records in search of material that is missing from its referenced location."). Thus, we need not investigate Mejia's claim further. Accordingly, we overrule his third issue.

## V.    ADMISSION OF PICTURES OF MEJIA'S TATTOOS

By his fourth issues, Mejia complains that the trial court improperly admitted pictures of his tattoos.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2011); *Green v. State*, 934 S.W.2d 92, 101–02 (Tex. Crim. App. 1996); *Montgomery v. State*,

26

810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990) (en banc). We may not reverse the judgment if the trial court's decision is within the zone of reasonable disagreement. *Martinez*, 327 S.W.3d at 736; *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); *Green*, 934 S.W.2d at 102; *Montgomery*, 810 S.W.2d at 391.

On appeal, Mejia complains that the pictures were admitted in violation of rules of evidence 402 and 403. *See* TEX. R. EVID. 402, 403. However, at trial, Mejia's trial counsel did not object to the pictures on the basis of rules 402 and 403. Therefore, Mejia's complaint on appeal has not been preserved. *See* TEX. R. APP. P. 33.1(a) (providing that error must be preserved by a timely objection); *Keeter v. State*, 175 S.W.3d 756, 759–60 (Tex. Crim. App. 2005) (explaining that we cannot find that the trial court erred when the appellant failed to make the complaint to it); *see also Gallo v. State*, 239 S.W.3d 757, 768 (Tex. Crim. App. 2007) (providing that appellate arguments must comport with objections at trial); *Swain v. State*, 181 S.W.3d 359, 367 (Tex. Crim. App. 2005) (setting out that appellant did not preserve issue for appellate review because his argument at trial did not comport with his argument on appeal). We overrule Mejia's fourth issue.

By a sub-issue, Mejia complains that the trial court violated rule of evidence 614 by allowing Garcia to testify. Mejia has not provided a clear and concise argument for his sub-issue. *See* TEX. R. APP. P. 38.1(i). Accordingly, we overrule it. *See id.*

### VI.    INEFFECTIVE ASSISTANCE OF COUNSEL

By his fifth issue, Mejia contends that his trial counsel rendered ineffective assistance for a variety of reasons. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Again, Mejia has provided a multifarious issue. As such, we may refuse to

27

review Mejia's multifarious issue or we may elect to consider the issues if we are able to determine, with reasonable certainty, the alleged error about which the complaint is made. *Stults*, 23 S.W.3d at 205; *Shull*, 4 S.W.3d at 51. We will only address the alleged errors that we are able to determine with reasonable certainty. *See Stults*, 23 S.W.3d at 205; *Shull*, 4 S.W.3d at 51. Those issues we do not address are inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

First, Mejia contends that his trial counsel rendered ineffective assistance by failing to object to Reyes's entire testimony. Mejia neither states under what rules Reyes's entire testimony was inadmissible nor establishes that there is a reasonable probability that but for Reyes's testimony he would not have been convicted. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim App. 1994) (explaining that to establish an ineffective assistance claim, the appellant must affirmatively show that trial counsel's performance was deficient and that the deficiency was prejudicial). Therefore, we cannot conclude that trial counsel should have objected to his entire testimony.

Mejia next argues that trial counsel was ineffective for not objecting to the prosecutor's closing comments. Mejia does not specify which comments he is referring to; however, he refers to a section in his brief, section "'2(e).'" In that section, Mejia claimed that the State improperly read the law to the jury. However, Mejia did not cite to the record or provide a clear and concise argument to support his contention. *See* TEX. R. APP. P. 38.1(i). Therefore, we are unable to address this issue. *See id.*

Next, Mejia complains that defense counsel was ineffective by failing to investigate the "true origins" of his tattoos. He states, "defense counsel was unable to

28

rebut the State's claims that such were of gang origin leaving Appellant's contention of such unsubstantiated and the defense inadvanced against that which was pivotal to the State's case in proving the engaging factor of the charge of the indictment." This is the extent of Mejia's argument. However, defense counsel did ask Mejia whether his tattoos were gang related, and Mejia testified that his tattoos were not gang related. Mejia testified that he copied his tattoos from a tattoo magazine. Therefore, defense counsel did attempt to rebut the State's claim that Mejia's tattoos were gang related.

We overrule Mejia's fifth issue.

## VII.  CONCLUSION

We affirm the trial court's judgment.

                           _____
                           ROGELIO VALDEZ
                           Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
16th day of August, 2012.

29