**Mario Rashad SWAIN, Appellant,**

v.

**The STATE of Texas.**

**No. AP–74854.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 2, 2005.

Rehearing Denied Jan. 25, 2006.

---

Patrice Savage, Carthage, for Appellant.

William M. Jennings, Criminal District Atty., Lance Larison, Carl Dorrough, Asst. Criminal District Attys., Longview, Matthew Paul, State's Atty., Austin, for State.

MEYERS, J., delivered the opinion of the Court, in which KELLER, P.J., and PRICE, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

Appellant was convicted in November 2003 of capital murder. TEX. PENAL CODE § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial court sentenced appellant to death. Art. 37.071,

§ 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises nineteen points of error, many of which are challenges to the admission of his oral and written statements as well as other evidence which he claims are the fruits of an illegal arrest. A brief summary of the facts surrounding his arrest and the taking of his statements will be helpful to address these points of error. We affirm.

## STATEMENT OF FACTS

Lola Nixon, the victim, lived in a house on Iris Circle in Longview, Texas. Nixon made plans to have dinner with friends on the evening of December 27, 2002, but never arrived at the restaurant. Neighbor Ashley Dulweber noticed a truck parked outside a vacant house on their street at around 9:00 p.m. that evening and reported it to police. A police officer who was dispatched to Iris Circle noted the license plate number of the truck and left about forty minutes later after seeing no unusual activity.

Nixon's friends contacted the police when they were unable to locate her on December 28. When the police arrived at Nixon's house, Nixon was gone and there was evidence of forced entry and blood throughout the house. The police checked the license plate number of the truck that had been parked on Iris Circle the previous night. They contacted the registered owner, who told them that his grandson, appellant, had possession of the truck. Appellant was not home when the police first attempted to contact him at his residence, but he called Detective Terry Davis about thirty minutes later. Davis told appellant that he wanted to talk to him, and appellant gave him the address of the resi-dential treatment home where he was working as an after-hours house sitter.

Davis and Detective Jim Nelson went to appellant's place of employment that evening and asked him why his truck had been on the victim's street the night before. He first stated that he parked the truck on Iris Circle while he went riding around with a friend. Davis responded that he did not believe him, and then appellant changed his story. He stated that he and a man named Casey Porter broke into a house on that street, that Porter beat the female homeowner who arrived home in the middle of the burglary, and that they placed her in the trunk of her black BMW, drove her to a remote location in southern Gregg County near the airport, and left her there alive. He then signed a consent form authorizing a search of his truck and agreed to show the detectives where he and Porter left the victim. They got into Davis' car, where Davis read appellant his *Miranda* warnings.[2] Appellant then directed the detectives to an area off Highway 349 near the airport. Nixon was not there, but they found blood on the grass and a black trash bag and a piece of a tire jack on the ground.

Davis took appellant to the Longview Police Department, where he again read appellant his *Miranda* warnings and took his first written statement shortly after midnight. Appellant stated that Porter beat a woman when they were burglarizing her home and that they left her at a secluded area "near Jerry Lucy Road and Farm–to–Market 349." Davis obtained a warrant to arrest appellant for burglary of a habitation at around 3:00 or 4:00 a.m. Police also arrested and questioned Porter,

---

1. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

but released him when they verified his alibi.

At 6:30 a.m. on December 29, Davis read appellant his warnings and took his second written statement, in which he said that Brian Mason Woods beat a woman while they were burglarizing her home, and that "she was alive when [they] left her off Highway 349."[3] The police then contacted Woods and excluded him as a suspect after confirming his alibi. Woods testified that appellant came to his house on the morning of December 28, told him that he had robbed a woman, and gave him some jewelry that he took during the robbery. Appellant also used credit cards that he took during the robbery to withdraw cash and fill Woods' car with gas.

Appellant was charged with burglary of a habitation and was taken before a magistrate for his statutory warnings at 10:30 a.m., at which time he requested the appointment of counsel. He was then taken to the Gregg County District Attorney's Office, where he was questioned by Detective Monty Gage and Mike Augustine, an investigator with the District Attorney's Office.[4] He left the office with Gage and Augustine and directed them to Nixon's body, which was located in an abandoned vehicle within a mile of where appellant first led the police. Nixon had been beaten over the head and stabbed in the chest. The medical examiner testified that "[t]he cause of death was homicidal violence, including sharp force injuries, blunt force injuries, and probable strangulation."

Appellant was taken back to the Longview Police Department, where Davis again read him his rights and took his third written statement at 1:00 p.m. In this statement, he admitted that he alone burglarized the victim's home, hit her in the head with a tire tool, attempted to clean her up in the bathroom, and placed her in the trunk of her black BMW. He drove her to a secluded area and placed her in an abandoned car, believing that she was still alive when he left. He then returned to the victim's house, attempted to clean up the scene, and left on foot. He later disposed of the tire tool in a dumpster at a CiCi's Pizza restaurant, used the victim's credit cards for gas and money, and gave Woods some jewelry. Police found the tire tool in a dumpster located across the parking lot from CiCi's Pizza. Police also searched appellant's truck and found black jeans, tennis shoes, and batting gloves stained with Nixon's blood, as well as keys to Nixon's car and her garage door opener.

## INDICTMENT

In point of error nineteen, appellant challenges the indictment, which alleged in pertinent part that appellant "intentionally cause[d] the death of an individual, namely, Lola Nixon, by cutting or stabbing her with a knife, or by striking her with a tire tool ..." Appellant argues that the indictment was defective because it alleged the manner and means in the disjunctive. This claim is forfeited on appeal because appellant failed to object to the indictment on this basis prior to trial. Art. 1.14(b). Point of error nineteen is overruled.

---

3. Appellant referred to Woods as "Mason" in his statement.

4. At the pretrial hearing on the motion to suppress, Gage testified that appellant told him and Augustine that he acted alone in the commission of the crime and agreed to direct them to the location where he left the victim.

At trial, Gage and Augustine testified only that appellant directed them to the location where he left the victim. Neither of them testified at trial regarding appellant's oral admission that he acted alone in the commission of the offense.

## VOIR DIRE

■ In point of error seventeen, appellant argues that the trial court abused its discretion when it refused to allow him to question veniremembers on the law of parole. The trial court denied appellant's request to ask the following questions of each veniremember:

1. Would the minimum length of time a Defendant could serve in prison before he could be paroled be something you would want to know in answering the special issues?
2. On which special issue would this be important?
3. How would this 40–year minimum sentence be important to you in answering the special issues?
4. Would you be more likely, or less likely, generally, to view a Defendant as a continuing threat to society if you knew he would not be paroled for a minimum of 40 years[?]

The trial court did not abuse its discretion by refusing to allow appellant to ask veniremembers these proposed questions. In *Sells v. State,* 121 S.W.3d 748, 756 (Tex.Crim.App.), *cert. denied,* 540 U.S. 986, 124 S.Ct. 511, 157 L.Ed.2d 378 (2003), we held that these questions are improper because they "implicate the strictures imposed by *Standefer* against commitment questions and by *Barajas* against ambiguous questions."[5] Point of error seventeen is overruled.

### ADMISSION OF WRITTEN AND ORAL STATEMENTS

Prior to trial, appellant filed a "Motion for Hearing on Voluntariness of Any Admission or Confession Whether Written or Oral" and a "Motion to Suppress Evidence" requesting the suppression of all written and oral statements he made to law enforcement officers at the time of or subsequent to his arrest. The State called Detectives Davis and Gage to testify at the pretrial hearing on these motions. At the conclusion of their testimony, appellant objected and the trial court ruled as follows:

[DEFENSE COUNSEL]: Your Honor, we'd argue that it be suppressed, that it does not comply with Article 38.22.

THE COURT: How?

[DEFENSE COUNSEL]: Well, I'm getting there, Your Honor. That pursuant to Article 38.23, that anything that doesn't comply with the previous article is not admissible. He's, one, shown no authority to make an arrest. He was arrested without a warrant. I don't see anywhere in the Code where just because somebody tells you they did something, that you can arrest them without a warrant. He indicates he was—he says detained, but he says he had him in the car, and he was not free to go, and he couldn't have gone if he had tried to go. He was not a felon with any evidence that he was about to escape. That would be pursuant to Article 14.03. He was not taken before a magistrate without unnecessary delay under Article 14.06.

\* \* \*

THE COURT: I'm going to find that the taking of the statements comply with all applicable requirements of the law. And I'm going to overrule the motion to suppress the statements. And they will be admitted in evidence on proper predicate at the trial on the merits . . .

---

**5.** *Standefer v. State,* 59 S.W.3d 177, 181 (Tex. Crim.App.2001); *Barajas v. State,* 93 S.W.3d 36, 39 (Tex.Crim.App.2002).

In his first four points of error, appellant contends that his oral statement to Gage and Augustine and his third written statement were obtained in violation of his right to counsel. In points one and two, he argues that the police violated his right to counsel under the Fifth and Sixth Amendments because they continued to question him after he appeared before the magistrate and requested the appointment of counsel. In points three and four, he argues that the taking of these statements after he requested the appointment of counsel "violated [his] Texas constitutional guarantee that he shall not be compelled to give evidence against himself, and shall have the right of being heard by himself or counsel, and thus deprived him of life, liberty, property, privileges or immunities, without due course of law." He also asserts in points three and four that these statements were inadmissible under Article 38.23 because they were obtained in violation of his right to counsel.

■ In his written "Motion to Suppress Evidence," appellant generally argued "[t]hat any statements made by Defendant were obtained in violation of his right to counsel and his right against self-incrimination as guaranteed by U.S. Const. amends. V, VI, and XIV, and Tex. Const. art. I, §§ 10 and 19." He also generally argued in his motion to suppress that his statements were inadmissible under Article 38.23. These arguments were global in nature and contained little more than citations to constitutional and statutory provisions. At the hearing on the motion to suppress, appellant failed to complain about being questioned after asserting his right to counsel, and instead simply object-

ed that his statements were inadmissible because the police illegally arrested him and failed to comply with the requirements of Articles 38.22, 14.03, and 14.06. Appellant's global statements in his pretrial motion to suppress were not sufficiently specific to preserve the arguments he now makes on appeal.[6] TEX. R. APP. P. 33.1. Points of error one, two, three, and four are overruled.

■ In points of error seven, eight, eleven, and twelve, appellant argues that his oral statements to Davis and Nelson and his first and second written statements were inadmissible fruits of an illegal arrest. He asserts that the admission of these statements violated the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, Article I, §§ 9, 10, and 19 of the Texas Constitution, and Article 38.23. We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex.Crim.App. 2002). We review the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported in the record.[7] *Id.* We will sustain the trial judge's decision if it is correct on any theory of law applicable to the case. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App.2000).

Appellant complains that he was illegally arrested without a warrant or probable cause. In his brief, he points to the testimony of Detective Nelson and argues that he was "under arrest" at the time he was handcuffed. Nelson testified at trial that appellant "appeared to be quite nervous" when he and Detective Davis questioned

---

6. At trial, appellant failed to object to the admission of his oral statement to Gage and Augustine and simply renewed his pretrial objection with regard to his third written statement.

7. The trial court's "Findings of Fact and Conclusions of Law on Defendant's Motions" explicitly refer only to the voluntariness of appellant's written statements and consent to search the truck.

him at the residential treatment home where he worked. He testified that at some point while they "were in the garage talking," he handcuffed appellant and stated that "[they] were going to detain him," because appellant was "moving around quite a bit" and he did not know "if he was just nervous or he was going to attempt to flee." Detective Davis, on the other hand, consistently testified that appellant was not placed in handcuffs, and that appellant became "detained" at the point when he got into Davis' police car and received his *Miranda* warnings.

■■ There is no bright-line test providing that mere handcuffing is the equivalent of an arrest. *Balentine,* 71 S.W.3d at 771. The relevant inquiry is whether a reasonable person would have believed that he was not free to leave under the circumstances surrounding the incident. *Anderson v. State,* 932 S.W.2d 502, 505 (Tex.Crim.App.1996), *cert. denied,* 521 U.S. 1122, 117 S.Ct. 2517, 138 L.Ed.2d 1019 (1997). In the instant case, appellant called Davis and gave him his workplace address. Davis arrived in his unmarked car and parked on the street in front of the residential treatment home. Davis testified that his "main focus and train of thought at that point in time was [appellant's] truck and why it was on Iris Circle." Davis testified that appellant was not in custody at the time he admitted his involvement in the burglary, but he was "not free to leave" at the point when he got into Davis' car.[8]

Even if we were to assume that appellant was arrested at the residential treatment home where he worked, the evidence viewed in the light most favorable to the trial court's ruling supports a finding that

the arrest did not take place until after he admitted his involvement in the burglary. Thus, appellant's admission that he was involved in the burglary and any prior statements he made to Davis and Nelson were not fruits of the arrest.

■ Warrantless arrests in Texas are authorized only in limited circumstances and are governed primarily by Chapter 14 of the Code of Criminal Procedure. *Amores v. State,* 816 S.W.2d 407, 413 (Tex.Crim.App.1991). Article 14.03(a)(1) authorizes the warrantless arrest of a person found in a suspicious place and under circumstances which reasonably show that an offense has been or is about to be committed. Any "place" may become suspicious when a person at that location and the accompanying circumstances raise a reasonable belief that the person has committed a crime and exigent circumstances call for immediate action or detention by police. *Gallups v. State,* 151 S.W.3d 196, 202 (Tex.Crim.App.2004), *citing Dyar v. State,* 125 S.W.3d 460, 468–71 (Tex.Crim.App.2003).

■ In this case, the circumstances reasonably showed that an offense had been committed. Nixon had been reported missing and there was evidence of forced entry and a bloody struggle in her home. Appellant was the driver of a truck parked on Nixon's street the night she disappeared. Appellant admitted that he and Porter broke into a house and that Porter beat the female homeowner. Exigent circumstances arose when appellant stated that he and Porter left the beaten victim alive at a remote location. Davis testified that his "biggest concern at that point in time was to go find Lola Nixon."

---

**8.** The officer's testimony is a factor to be considered, along with the other facts and circumstances of the detention, in determining whether an arrest has taken place.

*Rhodes v. State,* 945 S.W.2d 115, 117 (Tex. Crim.App.), *cert. denied,* 522 U.S. 894, 118 S.Ct. 236, 139 L.Ed.2d 167 (1997).

Davis further testified: "Obviously, based on that [statement], at that point in time, me not knowing whether or not I had a dead woman or not, I couldn't tell that from the crime scene, it was imperative that we find where this woman was possibly for her life." Nelson testified that he thought appellant might attempt to flee. Given appellant's nervous behavior and his admission that he had been involved in a crime, it was reasonable to believe that appellant would not remain at the residential treatment home if the officers left to obtain a warrant.

If appellant was arrested at the residential treatment home, then his warrantless arrest was authorized under Article 14.03(a)(1). Any oral or written statements appellant made thereafter were not fruits of an illegal arrest.[9] Points of error seven, eight, eleven, and twelve are overruled.

## ADMISSION OF EXHIBITS

In points of error five and six, appellant complains that the trial court erroneously admitted State's Exhibits 14, 34 through 48, 79, 90 through 123, and "the numerous photographs taken at the crime scene." He asserts that these exhibits should have been suppressed under the fruit of the poisonous tree doctrine and Article 38.23 because they were recovered based on statements obtained in violation of his right to counsel.

■ In his pretrial motion to suppress evidence, appellant generally requested suppression of "[a]ll tangible evidence obtained by the State of Texas, or its agents, as a result of Defendant's arrest." Appellant does not complain on appeal that these exhibits were fruits of an illegal arrest. Instead, he argues that the exhibits were fruits of statements taken in violation of his right to counsel. Appellant's trial objection does not comport with the issue raised on appeal; thus, he has failed to preserve his complaint for our review.[10] TEX. R. APP. P. 33.1. Points of error five and six are overruled.

■ In points of error nine, ten, thirteen, fourteen, fifteen, and sixteen, appellant argues that multiple State's exhibits and "the testimony placing appellant in possession of Nixon's credit cards" were inadmissible fruits of the illegal arrest. He specifically complains about State's Exhibits 24 through 26, which include the bloody grass, tire jack, and trash bag police found when appellant first showed them where he and Porter allegedly left the victim, and State's Exhibits 27 through 30 and 32, which include the various items police found in appellant's truck after he gave written consent to search the vehicle.[11] Appellant argues that the admission of this evidence violated his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, Article I, §§ 9, 10, and 19 of the Texas Constitution, and Article 38.23.

---

9. Davis took appellant's second written statement at 6:30 a.m., *after* he had obtained a warrant to arrest appellant for burglary of a habitation.

10. When the State moved to introduce Exhibit 14 into evidence at trial, defense counsel stated, "Pretrial objections." Each time the State moved to introduce the remaining exhibits into evidence, defense counsel stated, "No objection."

Even if preserved for review, appellant's "fruit of the poisonous tree" position apparently was rejected by the Supreme Court in *United States v. Patane*, 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (plurality opinion).

11. Appellant also complains of the admission of State's Exhibit 33, but the State did not offer this exhibit into evidence at trial.

When the State offered Exhibits 24, 25, and 26 into evidence during trial, appellant affirmatively stated that he had no objections. The affirmative acceptance of this previously challenged evidence waived any error in its admission. *Jones v. State,* 833 S.W.2d 118, 126 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993). Further, as we established in previous points of error, appellant was not subjected to an illegal arrest. Thus, the trial court did not abuse its discretion in admitting the remainder of the evidence at issue. Points of error nine, ten, thirteen, fourteen, fifteen, and sixteen are overruled.

## FUTURE DANGEROUSNESS

■ In his eighteenth point of error, appellant claims that the evidence is legally insufficient to support the jury's affirmative answer to the "future dangerousness" special issue because he had no prior criminal convictions and was a "model prisoner" while incarcerated awaiting trial. We review the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have concluded beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, § 2(b)(1); *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The State presented evidence at punishment that appellant had attacked several other women in the years before he committed the instant offense. Betty McDonald Clark testified that a man hid in the back seat of her car and attacked her from behind with a stun gun in August of 1999. When she escaped and ran inside a convenience store for help, the man stayed in her car for about five minutes, then exited the car and walked away. Police

later found that the dome light inside Clark's car had been removed. A police officer testified that appellant's fingerprints matched the fingerprints on the dome light cover and door of Clark's car.

Judith Harper testified that a man hid in the back seat of her car and attacked her from behind with a stun gun after she left a grocery store in October of 1999. Store employee Michael Maiden opened the passenger door, at which point Harper ran inside the store to call police. The man exited the vehicle, asked Maiden "what [his] problem was," and walked away. Harper testified that she later noticed that the dome light inside her car had been removed. Maiden identified appellant as the man involved in the incident.

Appellant's friend Crystal Hargett testified that she was riding with appellant once in 2000 when he asked her to knock on a woman's door and tell her that her car had broken down and that she needed to use her phone. When she asked him why, he stated that he needed to know if the woman was home or if she had any children, so he could go into her house when no one was there. Hargett pretended to go to the woman's door, then came back and told appellant she did not have a phone. Hargett testified that she was with appellant another time when he spotted a woman who left her car running at a gas pump. Appellant told Hargett to take the car and to knock the woman out if she came back to the pump, but Hargett refused his request.

In January 2001, Ashley Russell and Olivia Torres discovered that they were both dating appellant and decided to confront him by arriving together to pick him up from work. Appellant got into the car with them and drove off at a high rate of speed. He remained silent and kept driving when Torres asked him to let her out of the car, so she jumped out and began

running down the road. Appellant got out of the car, chased her, shoved her, knocked her down, and repeatedly kicked and hit her while she was on the ground. When Torres got up and ran toward a nearby house for help, appellant ran back to his car and drove away.

Russell continued to date appellant and lived with him from February to November of 2001. She testified that appellant kept items in his car such as a wrench and a brown glass bottle containing a substance that he said would "put people to sleep." Appellant spoke to Russell about "knocking older women out at car washes and taking their money," and following women home and watching them to determine the times they left and came home from work. Russell also testified that appellant kept a spiral notebook in which he recorded descriptions of women, automobiles, and license plate numbers.

Teresa McMene testified that she was hit in the head from behind as she was leaving the salon where she worked in October of 2002. She fell to the ground and saw a man standing over her, so she began kicking and screaming. The man yanked on her purse and broke its strap, then fled on foot. Police found a beer bottle and a wrench at the scene. In November of 2002, McMene discovered that her phone and cosmetology license had been taken from the salon. The investigating police officer testified that someone had tried to pry open a window and had jimmied the lock on the back door. Kristie Anderson, who was living with appellant at the time, testified that appellant brought home a phone that was similar to the one stolen from McMene.

Nicole Anderson testified that appellant attacked her in December of 2002. About a month prior to the attack, she had seen

appellant in front of her apartment building and had asked to borrow his phone. Then, on December 5, 2002, she was alone in her apartment with her newborn baby when she woke up at 3:00 or 4:00 a.m. and saw appellant standing in her room. As she held her baby and tried to turn on the light, appellant jumped on her, choked her, and demanded her money and credit cards. He threatened to kill her and held a knife to her at one point. Appellant stayed in her apartment for several hours and wore black gloves the entire time. He left through her bedroom window at 8:00 or 9:00 a.m., but returned with a brown glass bottle and said that he would "put [her] to sleep and make [her] forget everything that happened." He poured the substance on a cloth and held it to her face, causing her to pass out. When she awoke around 10:00 a.m. and tried to leave her apartment with her baby, appellant was standing outside her front door. He asked her where she was going and if she told anyone what had happened. She said she had not told anyone about the incident and that she was going to visit a friend down the street. Appellant responded that "[she] could go, and he wouldn't hold [her]," and then left.

Kristie Anderson lived with appellant from February 2002 until the time of his arrest. She testified that on December 27, 2002, she found a piece of paper in their apartment with the name "Lola Nixon," the phrase "Sitel girl" in parentheses, an address, and a license plate number written on it.[12] She had found other pieces of paper before that contained names, addresses, phone numbers, license plate numbers, and descriptions of vehicles. She testified that appellant also kept a bottle in their apartment which contained a substance that "you could knock somebody out with." She further testified that appellant told her he would "take [her]

12. The evidence showed that appellant and Nixon had both worked at Sitel.

down with [him]" and that he would have her children taken away if she testified against him at trial.

Both the facts of the instant offense and the other evidence showing appellant's escalating pattern of violence support a finding of future dangerousness. *Sonnier v. State*, 913 S.W.2d 511, 516–17 (Tex.Crim. App.1995); *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997). The evidence, viewed in the light most favorable to the verdict, was sufficient to support the jury's affirmative answer to the future dangerousness special issue. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. Any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *Id.* Point of error eighteen is overruled.

We affirm the judgment of the trial court.

WOMACK and JOHNSON, JJ., concurred.