

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

## NO. PD-0984-19

---

**THE STATE OF TEXAS, Appellant**
**v.**

**SEAN MICHAEL MCGUIRE, Appellee**

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIRST COURT OF APPEALS
### FORT BEND COUNTY

---

RICHARDSON, J., announced the judgment of the Court and filed an opinion in which HERVEY, NEWELL, and WALKER, JJ., joined. KEEL, J., filed a concurring opinion in which KELLER, P.J., YEARY, and SLAUGHTER, JJ., joined. MCCLURE, J., concurred.

## **O P I N I O N**

Can a peace officer legally arrest a suspect, without a warrant, for killing another person while driving intoxicated, even though the accident did not occur in the officer's presence? Yes. The Texas Code of Criminal Procedure 14.03(a)(1) has been interpreted to allow any peace officer to arrest a person found in a "suspicious place" and the circumstances of the case reasonably show that the person is guilty of a felony or breach

1

of the peace. We find that the arrest met the requirements of this statute, and that the officer formed probable cause to believe that both a felony and breach of the peace had occurred. Accordingly, we reverse the court of appeals and the trial court's suppression of Appellee's arrest and all evidence arising from it and remand the case to the trial court for further proceedings.

## **PROCEDURAL HISTORY**

This case has travelled a long and convoluted journey to reach this Court for the third time. Prior to our Court granting review, this case has been before both Houston courts of appeals on four separate occasions, petitions for discretionary review were filed and denied twice at our Court, and the State's petition for writ of *certiorari* was subsequently denied at the United States Supreme Court. Appellee was tried and convicted on two separate charges by a jury. The conviction for felony murder was reversed by the First Court of Appeals and remanded for a new trial. The conviction for failure to stop and render aid was affirmed by the First Court of Appeals and is not before this Court. This case has also been presided over by seven successive trial judges. The original judge on the case became ill prior to trial and another was recused in a contested motion to recuse. There was no live testimony presented on the current issue before this Court; the trial judge simply relied on the records and testimonies taken during prior pretrial proceedings and the jury trial. As a result, the transcripts of this proceeding had to be supplemented. The latest ruling now before this Court was made by Judge Brady Elliott who is no longer the judge

of the 268th District Court. On remand, consequently, an eighth judge will continue with this case.

**FACTS**

On the date alleged in the indictment, at approximately 12:35 am, Appellee Sean Michael McGuire, with his wife as a passenger, drove his truck into a motorcycle driven by David Stidman causing Stidman's death.[1] McGuire made a U-turn and drove to a nearby Shell gas station a tenth of a mile from the accident scene. There, he called his mother and two law enforcement friends.[2] Police investigating the collision were also informed that McGuire was waiting at the gas station. One of the officers, Trooper Tomlin, who responded to the collision scene went to the gas station to investigate. There, he encountered McGuire and his wife. He also encountered McGuire's mother—who had come to the gas station after McGuire called—standing outside of McGuire's truck. Trooper Wiles also came to the gas station from the crash scene shortly after Trooper Tomlin. Trooper Tomlin observed a piece of metal from the back fender of the motorcycle wrapped around the front of McGuire's truck. Trooper Tomlin also observed McGuire to have "red glassy eyes" and "an odor of alcohol coming from his person."[3] When he asked

---

[1] Trooper Filmore testified that reports of the collision were received by around 12:40 am. The accident, he estimated, may have actually occurred up to five minutes prior to the report to the police—making the collision time roughly 12:35 am. Trial Tr. 74-75.

[2] Other than passing information onward, the two law enforcement friends were not involved in the investigation. One friend was a deputy chief and the other was a narcotic officer.

[3] Trooper Filmore confirmed these observations of intoxication later at the scene of the accident. Trial Tr. 34.

McGuire what happened, McGuire told him that he "hit something" while driving and that his wife, sitting in the passenger seat at the time, had told him he "hit a person." In order to continue the investigation and because both McGuire and his wife were showing signs of intoxication, McGuire's mother was asked to bring the truck to the scene of the collision while McGuire and his wife were transported there by patrol car.[4]

Continuing the investigation at the scene of the accident, police found gouges on the road and other evidence indicating that after McGuire's truck hit Stidman, the truck continued to drag the motorcycle for 829 feet before coming to rest. Additionally, Stidman, himself, was thrown 214 feet from the point of impact and hit a guardrail. Concluding that McGuire was driving while intoxicated at the time of the collision leading to Stidman's death, Trooper Wiles arrested McGuire on suspicion of causing Stidman's death by reason of intoxicated operation of a motor vehicle and failure to stop and render aid, both felony offenses.

At a nearby hospital, McGuire's blood was drawn without a warrant or consent to determine his blood alcohol content. Somewhere between 90 minutes and 2.5 hours had passed from the time of the collision to the moment his blood was drawn. The State charged McGuire with felony murder by causing Stidman's death while driving intoxicated (enhanced to a first-degree felony by two prior out-of-state charges for driving while

---

[4] While riding in the patrol car, both McGuire and his wife were detained "pending further investigation" but not under arrest. They were not handcuffed and the patrol car doors were left unlocked. Furthermore, McGuire rode in the front passenger seat to the crash site. Trial Tr. 152-53.

intoxicated), a second count of intoxication manslaughter with a vehicle, and failure to stop and render aid. The jury convicted him of felony murder and failure to stop and render aid. The felony murder conviction was reversed in light of *Missouri v. McNeely*[5] however, McGuire's conviction for failure to stop and render aid was affirmed by the First Court of Appeals.

On remand and before the second trial began, Appellee filed a new motion to suppress, this time to suppress the arrest. Specifically he argued that the "only exception to the warrant requirement which could possibly apply in this case" was under 14.01(b) which requires an "offense committed in [the officer's] presence or within his view." Appellee, thus, requested suppression over the following items *after* his detention:

1. Photographs or video depictions of [Appellee].
2. Audio recordings of [Appellee].
3. Video recordings of [Appellee].
4. Statements of [Appellee].
5. Any other tangible items taken from [Appellee], his person or the vehicle he was allegedly operating not listed above;[6]

The State argued McGuire's arrest was lawful because probable cause existed, and he was found in a suspicious place under Tex. Code Crim. Proc. art. 14.03(a)(1). The State did not mention exigency at all in its written response. Furthermore, no new evidence was

---

[5] *McGuire v. State*, 493 S.W.3d 177 (Tex. App.—Houston[1st Dist.] 2016, pet. ref'd), *cert. denied*, 581 U.S. 1006 (2017); *Missouri v. McNeely*, 569 U.S. 141, 151 (2013).

[6] (1 Corr. CR 14) ("Motion to Suppress Evidence"). We note that Appellee did not include his vehicle nor any evidence obtained prior to detention.

submitted to the court during the suppression hearing, nor did anybody testify. The trial court did not hear any testimony and simply reviewed the pleadings, the 2012 suppression-hearing transcript, and testimony from the 2016 trial.[7] The trial court ultimately granted the suppression motion pertaining to the warrantless arrest based on those records.

With regard to which evidence was to be suppressed, the trial court clarified the boundaries during the suppression hearing. The court stated:

| | |
|---|---|
| THE COURT: | Well, let's clarify. Items taken from the vehicle, I'm not going to grant suppression as to that . . . .[8] |
| THE COURT: | "Tangible items taken from the defendant," I'm striking that . . . . Any information they received from the defendant prior to that time is useable. He was being detained at that point in time . . . .[9] |
| THE COURT: | From the time that he was placed in the car at the Shell station to the time that he was placed under arrest at the site of the dead body, that comes in . . . .[10] |
| THE COURT: | [A]t that point in time where this officer says, "You're under arrest," . . . is suppressed; and everything that arose from that -- the conversations that occurred therefrom is suppressed.[11] |

---

[7] The transcripts for these hearings were missing from the original record forwarded to this Court. They were produced through a supplement.

[8] (1 RR 35).

[9] (1 RR 37). The trial court's copy of the motion to suppress shows that the judge crossed out the entire "Any other tangible items . . . ." provision, and amended all other provisions with the limitations of either "after arrest/shown body" or "after placed in PD vehicle after arrest." (1 Corr. CR 14).

[10] (1 RR 58).

[11] (1 RR 60).

In short, the evidence to be suppressed did not include any physical evidence and was limited to what "arose" from his arrest. This would include such post-arrest evidence as McGuire's statements after arrest, dashcam video and audio recordings with McGuire in the police vehicle after arrest, and McGuire's booking photo.

This brings us to the present-day appeal by the State to this Court. Under the record brought before this Court, it is unclear what specific evidence Appellee sought to suppress. The record does not show whether such evidence would benefit or hurt either party's case.

However, with the suppression of the arrest and its fruits in place, the admissible inculpatory evidence includes the following:

- McGuire was operating the vehicle.
- McGuire made three phone calls (his mother and two acquaintances in law enforcement) indicating he hit "something."
- McGuire's wife, a passenger at the time of the collision, told him he hit a person.
- McGuire stopped his vehicle at a Shell station approximately 0.1 miles from the crash site instead of stopping at the scene and rendering aid.
- Physical evidence of a piece of motorcycle stuck in the grill of McGuire's truck.
- McGuire states to Trooper Wiles, "My wife said I hit a person."
- McGuire cried, covered his face, crouched, and stated he was "sorry" multiple times when near the motorcycle at the crash scene.
- The motorcycle was dragged approximately 829 feet.
- McGuire didn't notice the piece of motorcycle in the grill of his truck. He "didn't seem to know where it came from."
- Trooper Wiles noticed a strong odor of alcohol on McGuire, bloodshot and glassy eyes, and a dazed look on his face.
- McGuire refused a field-sobriety test by Trooper Wiles.

Nevertheless, because *some* evidence is suppressed and assuming for the moment that it is indeed determinative to the case, we now address whether suppression was warranted.[12]

### Standard of Review for Motions to Suppress

An appellate court reviews a trial court's ruling on a motion to suppress for an abuse of discretion.[13] Almost complete deference is given to the court's determination of historical facts and its rulings on the application of law to those questions of fact.[14] The same deference is afforded to the trial court in deciding mixed questions of law and fact that are based on an assessment of credibility and demeanor.[15] For mixed questions of law and fact that do not involve an evaluation of credibility and demeanor, however, we conduct a de novo review.[16] If the trial court's ruling is correct on any theory of law applicable to the case and reasonably supported by the evidence, the ruling will be upheld.[17]

### Seizures under Texas Law

---

[12] On appellate review, it can be difficult to evaluate the weight or need of any specific item of evidence without at least some pointers as to how the party intends to rely on it or not.

[13] *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010).

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Calloway v. State*, 743 S.W.2d 645, 651-52 (Tex. Crim. App. 1988).

Federal and State constitutional provisions explicitly protects the right of the people to be free from "unreasonable seizures and searches." Generally, searches and seizures may only be conducted pursuant to a warrant unless a recognized exception to the warrant requirement applies. Warrants for seizures and searches will not issue "without probable cause." Probable cause exists, under the totality of the circumstances, if the evidence shows at the moment of arrest that "the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrested person had committed or was committing an offense."[18] "Probable cause to arrest must point like a beacon toward the specific person being arrested."[19]

In that vein, Texas law also requires statutory authority to arrest when the arrest is warrantless.[20] Texas Code of Criminal Procedure 14.03(a)(1) provides one such avenue of authority for warrantless arrests:

> Any peace officer may arrest, without warrant . . . persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony, violation of Title 9, Chapter 42, Penal Code, breach of the peace, or offense under Section 49.02, Penal Code, or are about to commit some offense against the laws; . . . .

---

[18] *Parker v. State*, 206 S.W.3d 593, 596-97 (Tex. Crim. App. 2006).

[19] *Id*. at 597.

[20] *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002).

We have historically recognized that an overly liberal construction of the authority to determine what is a "suspicious place" could give police the arbitrary and unlawful "power to pass summary judgment upon a human being, and incarcerate him in a dungeon, although innocent of any crime against law or society."[21] Thus, in order to maintain "the obvious legislative intent of Chapter 14, protection of individual rights and furtherance of legitimate law enforcement," this Court has recognized that the use of "persons found in suspicious places" under Article 14.03 should "authorize warrantless arrests in only limited situations."[22] In doing so, our case law construing this statutory authority has evolved often parallel to the requirements of the Fourth Amendment on the federal side.

Accordingly, we have said that "[t]he determination of whether a place is a 'suspicious place' is a highly fact-specific analysis" because "few, if any, places are suspicious in and of themselves."[23] "Rather, additional facts available to an officer plus reasonable inferences from those facts in relation to a particular place may arouse justifiable suspicion."[24] Though several different factors "may be used to justify the determination of a place as suspicious," this Court has recognized at least one important

---

[21] *Joske v. Irvine*, 43 S.W. 278, 280 (Tex. Civ. App. 1897), *rev'd on other grounds*, 44 S.W. 1059 (Tex. 1898) (construing the predecessor statute, Article 249 of the Code of Criminal Procedure of 1895, to the modern Article 14.03). *See also Joske v. Irvine*, 44 S.W. 1059 (Tex. 1898) ("We are therefore of opinion that the record shows that plaintiff's arrest was unlawful.").

[22] *Johnson v. State*, 722 S.W.2d 417, 421 (Tex. Crim. App. 1986).

[23] *Dyar v. State*, 125 S.W.3d 460, 468 (Tex. Crim. App. 2003); *Johnson*, 722 S.W.2d at 421.

[24] *Johnson*, 722 at 421.

factor common to most scenarios: "The time frame between the crime and the apprehension of a suspect in a suspicious place is short."[25] This Court and a number of the courts of appeals have consequently found suspects lawfully arrested in "suspicious places" where (1) the suspect was arrested at a crime scene or somewhere linked to it, (2) shortly after a crime had taken place, and (3) the totality of the facts known to the police officer objectively point to the suspect's guilt in the commission of a felony or other breach of the peace under 14.03(a)(1).[26]

## **Analysis**

The appellate court below found suppression warranted because the State relied on but failed to fulfill the requirements of Tex. Code Crim. Proc. 14.03(a)(1). We note again there was no hearing or evidence received by Judge Elliott, he simply relied on the record from the prior hearings. Although the question of exigent circumstances was never argued in the suppression briefs and hearing, the court below relied on our opinion in *Swain v. State*[27] to require exigency as a required condition under the definition of "persons found

---

[25] *Dyar*, 125 S.W.3d at 468.

[26] *See Johnson*, 722 at 420-21 (detailing how Johnson, an apartment maintenance employee, was placed under warrantless arrest after police determined that (1) Johnson roughly matched the witness's description, (2) there was no sign of forced entry, (3) Johnson's set of master keys were found in the hallway in front of the door to the murder scene, (4) Johnson arrived on the scene minutes after police and offered an odd explanation for being there, and (5) blood was found on his pants); *Dyar*, 125 S.W.3d at 197 (detailing how Dyar was arrested for DWI after he was found by police still bleeding from his mouth minutes after wrecking his truck and walking on foot to his nearby home).

[27] *Swain v. State*, 181 S.W.3d 359 (Tex. Crim. App. 2005).

in suspicious places" in Article 14.03(a)(1). Thus, under the court of appeals' interpretation, Article 14.03(a)(1) requires "(1) probable cause existed, (2) the person was found in a suspicious place, and (3) 'exigent circumstances call for immediate action or detention by police.'"[28] Opining that the State failed to provide evidence showing exigent circumstances (even though the question was never argued at the trial level),[29] the court of appeals affirmed the suppression of the arrest and evidence flowing from it.

The State now asks this Court to disavow *Swain* and remove the exigency requirement under Article 14.03(a)(1)'s "suspicious places." Failing that, the State alternatively asserts that exigency exists under the facts of this case. Regardless of whether exigent circumstances are absolutely required under Article 14.03(a)(1), we find that there were exigent circumstances in this case to justify a warrantless arrest. If ever there was a case to be made for exigency, this case defines it. As a result, there is no need to disavow *Swain* at this time. Exigent circumstances to execute a warrantless arrest is supported throughout the record. Although there may be a case to made in the future with different facts that may not satisfy Article 14.03 (a)(1), those facts are not before us and there is no need to go down that road.[30] We are not in the business of issuing advisory opinions to unknown facts.

---

[28] *State v. McGuire*, 586 S.W.3d 451, 457 (Tex. App.—Houston [1st Dist.] 2019) (quoting *Swain v. State*, 181 S.W.3d 359, 366 (Tex. Crim. App. 2005)).

[29] The only arguments heard by the trial judge consisted of whether the gas station was a "suspicious place" since that was not the crime scene.

[30] *See e.g.*, *Armstrong v. State*, No. 05-21-00333-CR, 2022 WL 2816540 (Tex. App.—Dallas July 19, 2022, pet. granted).

*Probable Cause: Evidence Pointed to Appellee Like a Beacon*

A review of the facts known to police show probable cause to arrest "pointed like a beacon toward[s]" Appellee.[31] Though he was at a gas station, Appellee was only a short distance from the crash site—only a tenth of a mile away and only a short time after the estimated time of the crash. There were motorcycle parts lodged in the grill of his truck that he could not explain. Evidence at the crash site showed that Stidman, the victim, was hit while riding his motorcycle and was dragged roughly 829 feet. Stidman died at the scene. Appellee's wife who was riding in the passenger seat during the collision told Appellee that he had "hit a person." Furthermore, Appellee had made calls to his mother and two law enforcement friends and admitted that he "hit something." In addition to finding a cooler full of beer in Appellee's truck bed, police observed Appellee to have a strong odor of alcohol, bloodshot glassy eyes, and a dazed look on his face. Finally, Appellee refused to submit to standard field sobriety testing. These facts were sufficient to warrant an objectively prudent person to believe that Appellee had committed intoxication manslaughter if not felony murder. He had also failed to stop and render aid in a motor collision resulting in serious injury. Alternatively, police also had probable cause to believe that Appellee had unlawfully caused the death of another. Unlawfully causing the death of another, for the purposes of Article 14.03(a)(1), is at the very least a *breach of the peace*.[32]

---

[31] *Parker*, 206 S.W.3d at 597.

[32] "Texas courts have defined and interpreted the term 'breach of the peace' to mean an act that threatens to disturb the tranquility enjoyed by the citizens." *Ste-Marie v. State*, 32 S.W.3d 446,

13

To the extent that the trial court found otherwise on either of these points was clearly erroneous.

### *Suspicious Place and Exigent Circumstances*

The State argues on discretionary review that the court of appeals erred in affirming the trial court's suppression when the issue of exigency was not raised nor ruled on by the trial court. Because Appellee never raised the issue, nor put them on fair notice that it was contested, there was no reason for the State to present evidence or call witnesses to testify towards exigency. Thus, the State argues that they were unfairly deprived of an "adequate opportunity to develop a complete factual record" regarding exigency.[33] The State further argues that Article 14.03(a)(1) does not expressly contain an exigency requirement and that construing it to require exigency leads to absurd results. In response, Appellee argues that exigency actually was litigated in the trial court and that it is the fault of the State in choosing not to present further evidence of it.

We agree with the State in that they were not given fair notice of the exigency question which is not specifically mentioned in the statute. This unfairly deprived them of an adequate opportunity to develop a complete factual record. However, although the factual record regarding the question of exigency has not been *completely* developed, the existing factual record sufficiently establish that exigent circumstances exist here. As we

---

449 (Tex. App.—Houston[14th Dist.] 2000, no pet.); *see also Romo v. State*, 577 S.W.2d 251 (Tex. Crim. App. 1979) (finding DWI to be a breach of the peace under the Texas Penal Code).

[33] *State v. Esparza*, 413 S.W.3d 81, 90 (Tex. Crim. App. 2013).

previously noted, based on these facts, exigency existed to make a warrantless arrest, and there is no need to ignore it.

Exigent circumstances are circumstances that "call for immediate action or detention by police." [34] Accordingly, fact-specific scenarios may fulfill 14.03(a)(1)'s exigency requirement where it is overly impractical for police officers to obtain an arrest warrant while still furthering the goals of the public good under the totality of the circumstances. [35] Factors that may be considered include (1) whether the subject of probable cause is likely to leave the scene, (2) whether evidence of criminality is likely to be destroyed, degraded, or lost, and (3) whether the subject of probable cause poses a continuing and present danger to others. [36] Other considerations may multiply the

---

[34] *Swain*, 181 S.W.3d at 366.

[35] *See Kentucky v. King*, 563 U.S. 452, 460 (2011) (allowing exception to the Fourth Amendment warrant requirement when the "exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment."); *Payton v. New York*, 445 U.S. 573, 590 (allowing warrantless arrests inside a home if there are exigent circumstances).
Although it was in a different type of Fourth Amendment event (blood draws), the Supreme Court in *McNeely* discussed and approved warrantless police action in fact specific scenarios not too different from the instant case:

> We added that particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we found that it was appropriate for the police to act without a warrant.

*Missouri v. McNeely*, 569 U.S. 141, 151 (2013) (internal citations and quotes omitted).

[36] *Dyar v. State*, 125 S.W.3d 460, 471 (Tex. Crim. App. 2003) (Cochran, J., concur); *see Swain*, 181 S.W.3d at 366 ("Any 'place' may become suspicious [under Article 14.03(a)(1)] when a person at that location and the accompanying circumstances raise a reasonable belief that the person has committed a crime and exigent circumstances *call for immediate action or detention by police*." (emphasis added)).

magnitude of the exigency such as how difficult or time-consuming it is to obtain a warrant in relation to the above factors.

The totality of the facts in this case, though underdeveloped towards this point, show Appellee was in a "suspicious place" and exigent circumstances existed.[37] Police were faced with investigating a roadway homicide likely induced by driving while intoxicated. Police were faced with the challenge of conducting at least a preliminary investigation at around 1:00 am in the dark of night on a poorly lit intersection. Their ability to preserve and recover as much physical evidence as possible was significantly diminished compared to during business hours and under broad daylight. As Trooper Tomlin testified, debris from the accident and other evidence, such as skid marks, trails of vehicle fluids, and roadway scratches, needed to be identified and recorded because they disappear over time. Furthermore, there were only four DPS troopers on duty in the entire county that night. And three of them, including Trooper Tomlin, were spread out over 829 feet of roadway

---

[37] We agree with Justice Keyes's dissent from the First Court of Appeals regarding what constitutes a suspicious place:

> 'Few places, if any, are inherently suspicious. The determination of whether a place is suspicious requires a highly fact specific analysis.' As the Court of Criminal Appeals has explained, under article 14.03(a)(1),
>
>> Any place may become suspicious when an individual at the location and the accompanying circumstances raise a reasonable belief that the individual committed a crime and exigent circumstances call for immediate action or detention by the police.

*McGuire*, 586 S.W.3d 451, 466 (Tex. App.—Houston [1st Dist.] 2019) (Keyes, J., dissent) (first quoting *Lewis v. State*, 412 S.W.3d 794, 802(Tex. App.—Amarillo 2013, no pet.); and then quoting *Swain*, 181 S.W.3d at 366) (internal citations omitted).

stretching from the point of impact to the final resting place of the motorcycle. According to Trooper Tomlin, it took the three troopers "a couple of hours" by mostly flashlight to finish investigating the scene.[38] Though Appellee was cooperative to this point, there was no guarantee that he would not leave the scene at his earliest opportunity. And if he left in his vehicle, Appellee could have presented a danger to others.

In addition to the need to collect and preserve physical evidence at the scene, there was also an increasing need to preserve evidence of intoxication in Appellee's blood.[39] In addition to the natural attrition of the level of blood alcohol content over time, any additional consumption of alcohol or other intoxicants would have detrimentally degraded the reliability of any later collected blood draw evidence. Because *McNeely* had not been decided by the Supreme Court, the officers investigating the scene could not have known

---

[38] According to Trooper Tomlin, a number of Fort Bend Sherriff's deputies were also at the scene on the night of the collision, but they were mostly occupied with directing traffic (on an intersection near State Highway 99) so the investigating team of law enforcement wouldn't be hit while investigating the scene.

[39] In a blood draw suppression hearing leading up to the first trial, after both attorneys offered their knowledge of how late-night warrants are obtained in the county, Judge Higginbotham concluded the following:

> I've heard the argument of counsel and gone over your pleadings and these cases [including *Missouri v. McNeely*] that have been presented here.
> I believe that in this case, as I know it, that the police probably acted in accordance with what the law was at that time, as far as the Transportation Code.
> Also, I think that there *may have been exigent circumstances*. I don't know how. Was there a – was there a case, supreme court case, it doesn't define exigent circumstances. I just know that it's – that it is not defined as trying to do something about the dissipation of alcohol. And the totality of what I've heard here, I'm going to deny your supplemental motion to suppress.

Mar. 7, 2014 Pretrial Tr. 73 (emphasis added).

a warrant was required on the date in question. Nevertheless, they had ample information and evidence to form probable cause to arrest Appellee. All of the information that the police possessed, *including the place in which he was found*, "pointed like a beacon" towards Appellee and shining an inculpatory light upon him.[40] At the minimum, there was probable cause to arrest him for failure to stop and render aid.

Blood was drawn somewhere between 2:00 and 3:00 am—roughly 90 minutes to more than two hours after the collision. This delay was without any time taken to obtain a warrant. Assertions by the attorneys for the State and Appellee with personal knowledge suggest that obtaining a warrant Appellee's arrest would have added potentially hours of more delay (and was thereby very impractical).[41]

During pretrial hearing on March 7, 2014, the attorneys (both having some prior personal experience in obtaining warrants) detailed the unpredictability and difficulty of obtaining a warrant in the middle of the night in Fort Bend County. Around the time of trial, the steps to obtaining a warrant included the following. Depending on the night, an assistant district attorney may or may not have been on call to assist with getting a warrant. If no assistant district attorney was available, the officer would have had to prepare the

---

[40] *Parker*, 206 S.W.3d at 597.

[41] *See McNeely*, 569 U.S. at 156 ("[E]xigent circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant application process."). We realize that *McNeely* only deals with the seizure of blood in a DWI investigation as opposed to the DWI arrest in this case. However, there are useful parallels in the determination of "exigency" that may be applicable here.

warrant and affidavit themself and then contact a judge (from a list of judges and their phone numbers) to see if they were available to sign it. While there might have been a judge assigned to be "on call" for that night, according to the prosecutor, the "on call" judge was not always reliable or responsive. Trooper Tomlin testified that he was once unable to find a judge to sign off on a warrant in a prior instance in the middle of the night. The officer or on-call ADA would then drive to the judge's house—however far that might be—and get the warrant signed before returning to the scene for its execution. Furthermore, while some judges in Fort Bend County were willing to transmit warrants by facsimile, per the prosecutor, at least some were unable or unwilling to do so.[42] In summary, although there was no evidence regarding that specific night, the general added difficulty of getting a warrant at night combined with the type of crime and the need to preserve evidence are sufficient to demonstrate exigent circumstances under these specific facts.

### Conclusion

Under the facts of this case, the court of appeals below erred in finding suppression was warranted under Article 14.03(a)(1). We reverse the court of appeals and the trial court's suppression of Appellee's arrest and all evidence arising from it, and remand the case back to the trial court.

---

[42] *See id*. at 154-55 (finding natural blood-alcohol dissipation to no longer automatically qualifies as an exigency in a DWI scenario but must instead be evaluated on a case-by-case basis—after noting that search warrants can be obtained via electronic, telephonic, or radio communications but also acknowledging that electronic warrants may still be time-consuming and that "improvements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest.").

Delivered: February 21, 2024

Publish