**Opinion issued March 20, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00465-CR

_____

**DEMETRICK REESE ROGERS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 228th District Court**
**Harris County, Texas**
**Trial Court Case No. 1665540**

---

## MEMORANDUM OPINION

Appellant Demetrick Reese Rogers was found guilty by a jury of the offense of felony murder. *See* TEX. PENAL CODE § 19.02(b)(3). The jury assessed Rogers's punishment at twenty-five years in prison. In three issues on appeal, Rogers complains that (1) the evidence was legally insufficient to support his conviction;

(2) the trial court should have suppressed his recorded custodial statement; and (3) the trial court erred in denying his request to include a self-defense instruction in the jury charge.

We affirm the judgment of conviction.

## Background

Shortly before 1:00 a.m. on October 6, 2019, Rogers and his friends went to a daiquiri bar located in a strip center on Martin Luther King (MLK) Boulevard in Houston, Texas. The bar was a popular hangout spot for high-school and college-aged youths. That night, a crowd of about forty people was socializing in the parking lot and along the walkway running in front of the strip center. Rogers and his friends were hanging out on the walkway in front of a food store next to the daiquiri bar.

Mark Barnes-Calvin and his friends were also there that night. They were socializing on the walkway near a restaurant on the south end of the strip center. The south end of the strip center was next to a gas station, which was located at the corner of MLK Boulevard and Browncroft Street. The gas station and the strip center were separated by a metal fence.

About fifteen to twenty minutes after Rogers arrived, the crowd heard gunshots coming from the direction of the gas station. An investigation later revealed that the shots were fired on the southside of the gas station on Browncroft Street. A

2

cartridge casing was found halfway down Browncroft, about thirty yards from the gas station and 100 yards from the strip center parking lot.

Rogers and his friends were still standing in front of the food store when the shots were fired near the gas station. Hearing the gunfire, Rogers immediately pulled a firearm from his pants pocket, raised it over his head, and fired seventeen shots down the walkway toward the gas station. Bystanders on the walkway ran and ducked for cover, including Barnes-Calvin, who was at the south end of the walkway near the metal fence. Within a couple of seconds, Barnes-Calvin was shot in the head and collapsed. Other people on the walkway and in the parking lot also began shooting towards the gas station. During the shooting spree, another bystander, Brooklyn Rouse, was also shot.

When the shooting stopped, Rogers walked past Barnes-Calvin and Rouse lying on the ground, got into a vehicle, and left the scene. Rouse survived her injuries, but Barnes-Calvin died from the gunshot wound to his head later that day.

The police investigation of the shooting revealed that eight different firearms were fired during the incident, but none of the firearms were recovered. Sixty-seven cartridge casings of various calibers were found spread across four different areas of the crime scene. Three casings were located near the sidewalk between the strip center parking lot and MLK Boulevard. Eight casings were found along the metal fence separating the strip center from the gas station, and ten casings were recovered

3

near the middle of the strip center parking lot. But the majority of casings were found along the walkway between the storefronts and the parking lot.

Detective C. Cegielski with the Homicide Division of the Houston Police Department was assigned to investigate the shooting of Barnes-Calvin. He obtained surveillance videos from the strip center and the gas station, which revealed the events surrounding the shooting. The video footage showed seven people firing weapons at the strip center toward the gas station. The first person firing a weapon in the footage was wearing a light teal green t-shirt and baseball cap. Through his investigation, Detective Cegielski determined that person was Rogers. The video footage showed that—within a second of when people in the crowd reacted to the gunfire on Browncroft—Rogers pulled a gun from his pants and began immediately shooting toward the gas station. Within two seconds of when Rogers began shooting, Barnes-Calvin collapsed to the ground and remained there until first responders arrived. When the other gunmen shown in the surveillance began shooting toward the gas station, Barnes-Calvin had already collapsed.

On February 28, 2020, Detective Cegielski interviewed Rogers in jail, where he was in custody for unrelated charges. Rogers agreed to the interview and provided an audio-recorded statement. Detective Cegielski showed Rogers still images from the surveillance video. Rogers identified himself in the images and admitted that he was at the crime scene, but he denied having a gun or firing a weapon that night.

In May 2020, a grand jury indicted Rogers for the offense of felony murder. The indictment alleged, in relevant part, that Rogers

> unlawfully, intentionally and knowingly commit[ted] and attempt[ted] to commit the felony offense of Deadly Conduct by knowingly discharg[ing] a firearm at and in the direction of Mark Barnes-Calvin, and while in the course of and furtherance of the commission of and attempt to commit said offense did commit an act clearly dangerous to human life, to-wit: fire a firearm in the direction of Mark Barnes-Calvin and did thereby cause the death of Mark Barnes-Calvin.

The case was tried to a jury. During trial, Rogers sought to suppress the custodial statement that he gave to Detective Cegielski. Rogers alleged a violation to his Sixth Amendment right to counsel during the interview and asserted that he did not fully understand his rights when he agreed to it. Following an evidentiary hearing, the trial court denied the motion to suppress, and Rogers's recorded statement was admitted into evidence.

Detective Cegielski was among the State's trial witnesses and testified about the murder investigation. The surveillance videos were admitted into evidence, and Detective Cegielski provided testimony about the events shown in the footage.

The State's witnesses also included Dr. Ana Lopez, the assistant medical examiner who performed Barnes-Calvin's autopsy. She testified that Barnes-Calvin died as a result of the gunshot wound to his head. She described the gunshot wound and the trajectory of the bullet when it entered Barnes-Calvin's head. Dr. Lopez watched the surveillance footage and opined that Barnes-Calvin's injuries were

5

consistent with the direction and trajectory of Rogers's gunfire. She noted that Barnes-Calvin was facing Rogers when he was shot, which was consistent with the entrance wound at the top of his head and the downward trajectory of the bullet from front to back after entering his skull. Dr. Lopez also explained why Barnes-Calvin's injuries were not consistent with the bullet being fired from behind or to his side.

At trial, Rogers's defense primarily centered on the theory that one of the other gunmen fired the shot causing Barnes-Calvin's death. During opening statements, Rogers stated that the evidence would show that there were eight shooters and none of the guns were recovered, so the State could not prove that Rogers caused Barnes-Calvin's death. Much of Rogers's cross-examination of the State's witnesses focused on eliciting testimony to support this theory.

Rogers was the only witness to testify for the defense. He acknowledged that he was not truthful when he told Detective Cegielski that he had not fired a gun that night. Rogers testified that, when he heard gunfire from the gas station, he instinctively started shooting "to save everyone." He acknowledged shooting toward but shot "[u]pwards over everybody." He was "aiming over the fence" and held the gun "so high, to make sure that [he] didn't hit nobody." Rogers maintained throughout his testimony that he did not cause Barnes-Calvin's death.

## Sufficiency of the Evidence

In his third issue, Rogers contends that the evidence was legally insufficient to support his conviction for the offense of felony murder.[1]

### A.     Standard of Review

We review a challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). Pursuant to the *Jackson* standard, we "consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 243 (Tex. Crim. App. 2019) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *see Jackson*, 443 U.S. at 319. We hold evidence to be insufficient under the *Jackson* standard "when the record contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt." *Britain*

---

[1]     Although raised as his third issue, we address Roger's sufficiency issue first because, if meritorious, it would result in his acquittal. *See Benavidez v. State*, 323 S.W.3d 179, 182 (Tex. Crim. App. 2010) (holding sufficiency of evidence, when raised, must be addressed before trial error because sustaining it results in acquittal and "would interpose a jeopardy bar to retrial"); *Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("We address appellant's second issue first because it challenges the sufficiency of the evidence and seeks rendition of a judgment of acquittal.").

*v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 320).

The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326.

Our review of the record includes all of the evidence introduced, whether it was properly or improperly admitted. *See Winfrey*, 393 S.W.3d at 767 (stating courts consider admissible and inadmissible evidence presented at trial when conducting sufficiency analysis). Direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 13. Finally, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.*

**B.    Applicable Legal Principles**

A person commits felony murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the person commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(3). The Court of Criminal Appeals explained that felony murder is "an unintentional murder committed in the course of committing a felony." *Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014). Here, the underlying felony alleged in the indictment was deadly conduct, which is committed when a person "knowingly discharges a firearm at or in the direction of . . . one or more individuals." TEX. PENAL CODE § 22.05(b)(1); *see Washington v. State*, 417 S.W.3d 713, 721 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (recognizing that felony offense of deadly conduct may serve as underlying felony for proof of felony murder).

**C.    Analysis**

To establish that he committed the offense of felony murder as alleged in the indictment, the State was required to prove that Rogers committed or attempted to commit the offense of deadly conduct by discharging a firearm in the direction of Barnes-Calvin, and while committing or attempting to commit that offense, Rogers committed "an act clearly dangerous to human life," namely, "fir[ing] a firearm" in

Barnes-Calvin's direction and thereby causing his death. *See* TEX. PENAL CODE § 19.02(b)(3); *id.* § 22.05(b)(1).

On appeal, Rogers contends that the evidence was insufficient to support his conviction because the State did not prove the causation element of felony murder. *See id.* § 19.02(b)(3). He asserts that the State failed to offer sufficient evidence to show that one of the shots that he fired in Barnes-Calvin's direction—rather than a shot fired by another gunmen—caused Barnes-Calvin's death. He points out that no firearms were recovered and that no forensic evidence linked a specific firearm to the fatal shot. He also claims that "no forensic trajectory evidence was admitted linking [his] gunfire to the fatal bullet in this matter." But, in making his argument, Rogers fails to consider the entirety of the State's evidence and does not acknowledge the cumulative force of all the evidence.

The jury viewed video footage taken from different angles and vantage points at the strip center and the gas station showing the scene before, during, and after the shooting. The footage showed the locations of seven of the eight gunmen, the direction they were shooting, and when they fired their weapons.

In the footage, Rogers was hanging out with his friends on the walkway in front of the food store when people in the crowd turn to look toward the gas station. Several witnesses, including Rogers, testified that was the moment when the crowd heard gunfire coming from that direction. At that moment, Rogers immediately

10

pulled a firearm from his pocket and began shooting towards the gas station. Detective Cegielski testified that Rogers fired approximately seventeen shots.

The video footage showed Barnes-Calvin trying to take cover on the south end of the walkway directly down from Rogers. When Rogers began shooting, Barnes-Calvin was crouching, had his head lowered, and was stepping forward toward Rogers. Rogers held the gun above his head, but it was pointed in a downward angle as he fired. Within two seconds of when Rogers opened fire, Barnes-Calvin suddenly collapsed and fell sideways to the ground where he remained. He did not put out his arms or otherwise attempt to break his fall. The footage shows that Rogers was the first person to open fire. When Barnes-Calvin collapsed, none of the other people had begun shooting. The second person shown in the footage to open fire did so a couple of seconds after Barnes-Calvin collapsed.

Dr. Lopez testified that she conducted Barnes-Calvin's autopsy. She explained that the fatal gunshot entered Barnes-Calvin's head approximately one-and-a-half inches below the top of his head and two inches to the left of the midline of his body. The bullet's trajectory was downward from front to back, and slightly left to right. The bullet exited the back of Barnes-Calvin's head approximately six-and-a-half inches below the top of his head on his left side. After reviewing the video footage, Dr. Lopez opined that the gunshot wound was consistent with the direction and trajectory of Rogers's gunfire in relation to Barnes-Calvin's position and stance.

Dr. Lopez explained that Barnes-Calvin was facing Rogers when he was shot, which was consistent with the entrance wound and the downward trajectory of the bullet from front to back. She agreed that the entrance wound and the trajectory of the bullet would have been different had Barnes-Calvin been shot from behind or from his right side. She also agreed that his injuries were not consistent with a shooter firing from behind Barnes-Calvin or to his right.

Dr. Lopez stated that the entrance wound had a "keyhole defect," which she explained meant that the bullet entered Barnes-Calvin's head at a "shallow angle," rather than a 90-degree perpendicular angle. She explained that, when a bullet enters at a shallow angle, part of it breaks off and exits the skin. This creates a slit-like defect on the skull that looks like a keyhole. She explained that when a bullet enters at a straight 90-degree angle it will "produce a nice, round defect with inward beveling," not the keyhole effect. Dr. Lopez opined that the keyhole defect that she observed was consistent with the bullet striking Barnes-Calvin while he was in the crouched position that he was shown in when he was shot.

Besides evidence showing that Rogers fired the bullet that caused Barnes-Calvin's death, the State also offered evidence indicating that none of the other gunmen at the scene fired the fatal shot. Detective Cegielski testified that the investigation into the shooting revealed that eight people, including Rogers, had fired guns at the scene. Seven of those people are shown in the video footage.

12

Through his investigation, Detective Cegielski learned the identity of five of the gunmen, including Rogers. Detective Cegielski testified about the location of the shooters and the timing of when they fired their guns. The State played the video footage for the jury during Detective Cegielski's testimony.

Detective Cegielski testified that Rogers was the first person to pull out a gun and fire. He stated that Barnes-Calvin was shot and collapsed to the ground within two seconds of Rogers pulling out his gun and firing. He said that "no one else had fired at that point." Detective Cegielski testified that the second person on the walkway to open fire was Damon Diggs. He was shown in the video footage firing several shots toward the gas station while aiming up and to the left of where Barnes-Calvin was located on the walkway. He did not fire his first shot until after Barnes-Calvin had already collapsed.

The third shooter, C.F.W. (a juvenile), was standing behind Rogers when the shooting started. He had some difficulty pulling his gun from the waistband of his pants. He did not pull out his gun and fire before Barnes-Calvin had collapsed.

The fourth shooter was Kiante Mitchell. He was also standing behind Rogers on the walkway when the shooting started. When Rogers opened fire, Mitchell turned and retreated. Mitchell was facing away from Barnes-Calvin when Barnes-Calvin collapsed. As he walked away, Mitchell fired five shots behind him but that was approximately nine seconds after Barnes-Calvin collapsed.

Detective Cegielski did not learn the identity of the fifth shooter. The fifth shooter was in front of Rogers on the walkway when the crowd heard the gunfire from Browncroft Street. The fifth shooter pulled a gun from his waistband and turned and ran to the northern end of the walkway. He did not immediately fire his gun, and he was stooped over and facing away from Barnes-Calvin when he collapsed. The fifth shooter ran between two parked cars and then turned and opened fire in the parking lot. The shots were up and away from Barnes-Calvin. The shots were fired approximately five seconds after Barnes-Calvin collapsed.

The sixth shooter is the only shooter not captured in the video firing his weapon, but Detective Cegielski believed that the sixth shooter was Shamarkus King. Detective Cegielski linked King to three .45 caliber casings recovered from the sidewalk between the parking lot and MLK Boulevard. Detective Cegielski testified that the surveillance cameras did not cover that area of the sidewalk, but King was shown in the video footage pulling a gun from his waistband when the crowd reacted to the gunfire. King then turned and ran through the parking lot toward MLK Boulevard. King was facing away from Barnes-Calvin when he collapsed.

The State also points out that, regardless of whether King was the sixth shooter, a forensic report admitted into evidence showed that the .45-caliber casings were recovered from the sidewalk at the parking lot entrance on MLK Boulevard. The parking lot and its entrance were on Barnes-Calvin's right side when he

14

collapsed. Thus, the jury could have reasonably inferred that the shots from the .45-caliber weapon were fired from Barnes-Calvin's right, which, as Dr. Lopez testified, was not consistent with the entrance wound.

Finally, the video footage showed that the seventh and eighth shooters were in a black car parked near the fence at the southern end of the strip center. About ten seconds after Barnes-Calvin collapsed, the front seat passenger fired through the car's open door toward MLK Boulevard. A few seconds later another person in the car fired in the same direction. Both gunmen were behind Barnes-Calvin when they fired, and both fired away from him.

Viewing the evidence in the light most favorable to the verdict and considering the cumulative force of all the evidence, we conclude that a rational jury could have found beyond a reasonable doubt that Rogers's conduct of firing a gun in Barnes-Calvin's direction caused his death. *See* TEX. PENAL CODE § 19.02(b)(3); *Jackson*, 443 U.S. at 319. Accordingly, we hold that the evidence was legally sufficient to support the judgment of conviction. *See Washington*, 417 S.W.3d at 722–23 (holding that cumulative force of evidence was legally sufficient to support appellant's guilt for felony murder where evidence linking appellant to fatal shot included testimony about the location of car appellant was in at time of shooting in relation to other vehicles, locations and angles of bullet entrance damage to various

vehicles, bullet exit strike damage to rear window frame near where appellant was seated, and appellant's admission that he had fired his weapon).[2]

## Suppression of Custodial Statement

In his first issue, Rogers contends that the trial court should have suppressed the custodial statement that he gave to Detective Cegielski.

### A.  The Suppression Hearing

During trial, the court conducted a hearing outside the presence of the jury to determine whether Rogers's custodial statement should be suppressed. The parties stipulated that Rogers gave the audio-recorded statement to Detective Cegielski during an interview on February 28, 2020, while Rogers was confined to the Harris County Jail. Rogers had been in custody since February 21, 2020, on charges of evading arrest and unlawful possession of a weapon by a felon.

The State filed the complaint for the instant offense of felony murder on February 22, 2020. When Detective Cegielski interviewed him on February 28, Rogers had not yet been appointed counsel in the instant case or for the unrelated charges. At the suppression hearing, Detective Cegielski testified that, before

---

[2]  Rogers asserts that the evidence linking him to the fatal shot is insufficient when compared with the evidence in *Washington v. State*, 417 S.W.3d 713, 722–23 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). We disagree. Similar to *Washington*, the State presented evidence showing where Rogers and the other gunmen were in relation to Barnes-Calvin when he was shot and the direction from which they fired their weapons. Based on the entrance wound and the trajectory of the bullet, Dr. Lopez provided testimony showing the direction from which the bullet was fired. And, like in *Washington*, Rogers admitted to firing his gun.

16

interviewing Rogers, he checked "the Harris County system" and determined that Rogers was not represented by counsel. Trial counsel was appointed to represent Rogers in the unrelated cases on March 3, 2020 and in the instant case on March 6, 2020.

Along with Detective Cegielski's testimony, the State offered the audio recording of Rogers's statement into evidence for purposes of determining the suppression issue. The evidence showed that, before beginning the interview, Detective Cegielski introduced himself to Rogers as a homicide detective who was investigating an October 2019 murder. He read each warning to Rogers required by Code of Criminal Procedure Article 38.22, section 2(a).[3] Rogers indicated that he understood each warning and agreed to voluntarily waive his rights and speak with

---

[3]   Article 38.22 provides that no written or oral statement of an accused made as a result of "custodial interrogation" shall be admissible against him in a criminal proceeding unless he is informed of the following rights:

> (1)   he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at trial;
> (2)   any statement he makes may be used as evidence against him in court;
> (3)   he has the right to have a lawyer present to advise him prior to and during any questioning;
> (4)   if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
> (5)   he has the right to terminate the interview at any time.

TEX. CODE CRIM. PROC. art. 38.22, § 2(a); *see id.* § 3(a).

17

Detective Cegielski. During the interview, Detective Cegielski showed Rogers still-images from a surveillance video. The images showed the walkway in front of the food store on the night of the shooting. Rogers identified himself as one of the people in images. He said that he heard shooting, but he denied having a gun or firing a weapon. After about thirteen minutes, Rogers asked to terminate the interview and speak with an attorney. Detective Cegielski then concluded the interview.

Rogers did not testify or present evidence at the suppression hearing. He argued that his recorded statement should be suppressed because (1) he had not fully understood his rights and (2) his invocation of the right to counsel at the end of the interview raised a concern "about his Sixth Amendment rights not being fully represented here."

The trial court denied the motion to suppress and found that Rogers voluntarily waived his rights, observing as follows on the record:

> If we look at [Article] 38.22, it's got essentially three supports to get in: Did the defendant knowingly, intelligently, and voluntarily waive his rights to counsel and give the statement. When Cegielski comes in, the first thing he says to him, let me be sure you understand your rights. He's [sic] starts reading through the *Miranda* 38.22, word for word, almost, and each right individually he asked "Do you understand that." He gets an affirmative acknowledgement from Mr. Rogers.

> His speech is slow and accurate. It doesn't seem to be in any way intimidating by level of voice. The voices are calm and measured. At one point, when Mr. Rogers is told you can terminate the interview, I think he gets that "terminate" can be a big word, and he says do you understand the term. And Mr. Rogers is close, and the officer clarifies

18

that means you can stop. So he bent over backwards to be sure that Mr. Rogers understood his rights and voluntarily waived his rights.

## B.      Preservation of Appellate Complaints

On appeal, Rogers argues that the trial court should have suppressed his recorded statement because it was obtained through police "overreach" in violation of his right to due process and Article 38.22. He asserts that Detective Cegielski coerced him into giving the statement by the use of deceptive police tactics. Specifically, Rogers claims that Detective Cegielski (1) interviewed him even though he knew that Rogers "was represented by counsel in another matter,"[4] (2) did not disclose to Rogers that he had been charged with murder, and (3) told Rogers that he had photos of him holding a firearm but did not show Rogers the photos during the interview.

To preserve error for appellate review, a defendant must state the grounds for the ruling he seeks "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). If the trial court denies a defendant's motion to suppress, the issue raised on appeal must comport with the grounds for suppression raised in the trial court. *See Swain v. State*, 181 S.W.3d 359, 367 (Tex. Crim. App. 2005). If it does

---

[4]      As mentioned, the record shows that Rogers was not yet represented by counsel in the instant case or in the unrelated cases when Detective Cegielski interviewed him.

19

not comport, the appellate issue is not preserved. *See* TEX. R. APP. P. 33.1(a)(1); *Swain*, 181 S.W.3d at 367.

Here, the record shows that, in the trial court, Rogers raised two grounds to support suppression of his statement: (1) he alleged a violation to his Sixth Amendment right to counsel during the interview and (2) he asserted a general argument that he did not fully understand his rights. Rogers did not raise his appellate complaints—that Detective Cegielski obtained his statement by using police overreach and coercive tactics—as grounds for suppression in the trial court. Because Rogers's appellate complaints do not comport with his trial-court complaints, we hold that they are not preserved for our review. *See* TEX. R. APP. P. 33.1(a); *Swain*, 181 S.W.3d at 365; *see also Smith v. State*, 532 S.W.3d 839, 841 (Tex. App.—Amarillo 2017, no pet.) ("[T]he grounds [for suppression] urged below do not comport with those urged on appeal, and that effectively waives the latter as basis for reversal."); *Sloan v. State*, 418 S.W.3d 884, 891 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (holding that claim of "police overreaching" was not preserved for review because it was not specifically mentioned in defendant's written motion to suppress or during suppression hearing).

We overrule Rogers's first issue.

20

## Self-Defense Instruction

In his second issue, Rogers contends that the trial court erred in denying his request for a jury instruction on self-defense.[5] In response, the State argues that Rogers was not entitled to the instruction because during trial he denied causing Barnes-Calvin's death.

### A.    Standard of Review and Applicable Legal Principles

Chapter Nine of the Penal Code contains several defenses to prosecution, including the provision governing self-defense, which provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE §§ 9.02, 9.31(a). "Self-defense is a justification for otherwise unlawful conduct." *Torres v. State*, 7 S.W.3d 712, 714 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd).

When determining whether a defensive instruction should have been provided, appellate courts "view the evidence in the light most favorable to the defendant's requested" instruction. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). Generally, a defendant is entitled to a jury instruction on a defensive issue if the defensive issue "is raised by the evidence, regardless of the strength or

---

[5]    In the trial court, Rogers also requested jury instructions on use of deadly force and defense of a third party. On appeal, Rogers's brief complains only about the trial court's denial of his request for a jury instruction on self-defense.

21

credibility of that evidence." *Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013). "Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law." *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007).

Self-defense is a "confession and avoidance" defense. *See Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). Confession and avoidance is a judicially imposed requirement that requires defendants who assert a justification defense, such as self-defense, to admit, or at a minimum to not deny, the charged conduct. *Rodriguez v. State*, 629 S.W.3d 229, 231 (Tex. Crim. App. 2021); *see Jordan*, 593 S.W.3d at 343 ("Self-defense is a confession-and-avoidance defense requiring the defendant to admit to his otherwise illegal conduct."). A defendant "cannot both invoke self-defense and flatly deny the charged conduct." *Jordan*, 593 S.W.3d at 343.

A defendant is entitled to a self-defense instruction only "when the defendant's defensive evidence essentially admits to every element of the offense including the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct." *Shaw*, 243 S.W.3d at 659. The Court of Criminal Appeals clarified that a defendant is not required to concede the State's version of events and admitting to the conduct does not necessarily mean admitting to every

element if the defendant "sufficiently admits" to the commission of the offense. *See Gamino v. State*, 537 S.W.3d 507, 511–12 (Tex. Crim. App. 2017).

## B.    Analysis

As discussed, Rogers was charged with the offense of felony murder. Penal Code section 19.02(b)(3) provides that "[a] person commits [the offense of felony murder] if he commits or attempts to commit a felony" and in the course thereof "commits or attempts to commit an act clearly dangerous to human life that *causes the death* of an individual." TEX. PENAL CODE § 19.02(b)(3) (emphasis added). In the indictment, the State alleged that Rogers committed the felony offense of deadly conduct "by knowingly discharg[ing] a firearm at and in the direction of Mark Barnes-Calvin," and in the course of committing that offense, "committed an act clearly dangerous to human life: "fir[ing] a firearm in the direction of Mark Barnes-Calvin" and "thereby caus[ing] the death of Mark Barnes-Calvin."

On appeal, Rogers argues that he was entitled to a self-defense instruction because he offered evidence showing that the gunfire he heard coming from the direction of the gas station made him "fear[] for himself and others," and he responded by firing his weapon in that direction. But, at trial, Rogers based his defense primarily on the theory that one of the other gunmen at the scene fired the fatal shot, not him. While he admitted to firing his gun, Rogers testified that he held it "[u]pwards over everybody." He said that he aimed high over the fence toward the

23

gas station. Rogers explained that he held the gun "so high, to make sure [he] didn't hit nobody." Throughout his testimony, he expressly denied that he caused Barnes-Calvin's death.

Even viewing the evidence in the light most favorable to the requested instruction, Rogers was not entitled to a self-defense instruction because he did not sufficiently admit to the commission of the charged offense of felony murder; to the contrary, he denied it. *See Jordan*, 593 S.W.3d at 343; *Gamino*, 537 S.W.3d at 511–12; *see also Hudgins v. State*, No. 14-19-00210-CR, 2021 WL 786587, at *3 (Tex. App.—Houston [14th Dist.] Mar. 2, 2021, pet. ref'd) (mem. op., not designated for publication) (holding that appellant was not entitled to self-defense instruction because he denied shooting complainant and blamed it on another person). Thus, the trial court did not err in denying Rogers's request for a self-defense instruction.

We overrule Rogers's second issue.

## Conclusion

We affirm judgment of the trial court.


Kristin Guiney
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).